UNITED STATES of America, Appellee,

v.

Dwayne DOLAN, Appellant.

No. 75–1150.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 4, 1976.

Decided Nov. 11, 1976.

---

Philip A. Roberts, Jr., Chesterfield, Va. [court-appointed counsel] (Garner & Roberts, Chesterfield, Va., on brief), for appellant.

John A. Field, III, U. S. Atty., Charleston, W. Va. (Frank E. Jolliffe, Asst. U. S. Atty., Charleston, W. Va., on brief), for appellee.

Before WINTER, RUSSELL and WIDENER, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

Dwayne Dolan[1] was convicted by a jury on four counts of interstate travel with intent to carry on unlawful narcotics business enterprises in violation of 18 U.S.C. §§ 1952(a)(3) and 2.[2] He was sentenced to four concurrent five-year terms of imprisonment; and he appeals, challenging the sufficiency of the evidence and the propriety of supplemental jury instructions given by the trial court. Finding no merit in his contentions, we affirm.

Appellant's strongest argument is that the evidence at trial was legally insufficient to prove that the substances involved in the transactions for which he was convicted were, in fact, controlled substances under the federal narcotics law.

Our consideration of this contention is guided by two principles.

First, in passing on the sufficiency of the evidence to sustain a criminal conviction, we decide not whether the evidence would have persuaded us to return a guilty verdict but whether, viewing the record in the light most favorable to the government, there was substantial evidence from which the jurors could have concluded without a reasonable doubt that the defendant committed the offense charged. *United States v. Sherman* (4th Cir. 1970), 421 F.2d 198, 199, *cert. denied,* 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970).

Second, lay testimony and circumstantial evidence may be sufficient, without the introduction of an expert chemical analysis, to establish the identify of the substance involved in an alleged narcotics transaction, *United States v. Gregorio* (4th Cir. 1974), 497 F.2d 1253, 1263, *cert. denied,* 419 U.S. 1024, 95 S.Ct. 501, 42 L.Ed.2d 298 (1974). Such circumstantial proof may include evidence of the physical appearance of the substance involved in the transaction, evidence that the substance produced the expected effects when sampled by someone familiar with the illicit drug, evidence that the substance was used in the same manner as the illicit drug, testimony that a high price was paid in cash for the substance, evidence that transactions involving the substance were carried on with secrecy or deviousness, and evidence that the substance was called by the name of the illegal narcotic by the defendant or others in his presence, *United States v. Gregorio, supra* (497 F.2d at 1263); *United States v. Quesada* (5th Cir. 1975) 512 F.2d 1043, 1045, *cert. denied,* 423 U.S. 946, 96 S.Ct. 356, 46

---

1. The appellant testified at trial that the correct spelling of his name is Dewayne Dolin. The attorney for appellant stated for the record that no point was made of the misnomer.

2. The original indictment, No. 74–72–CH, contained seven counts. Count Four was superseded by No. 74–116–CH, a single-count indictment. Prior to consolidated trial on the two indictments, the government voluntarily dismissed Count Two which alleged unlawful distribution of drugs in violation of 21 U.S.C. § 841(a)(1); and the jury acquitted on Counts Three and Seven which also alleged unlawful distribution. The four counts on which Dolin was convicted were Counts One, Five and Six of No. 74–72–CH and the sole count of No. 74–116–CH.

L.Ed.2d 277 (1975); *United States v. Lawson* (7th Cir. 1974), 507 F.2d 433, 438–39, *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975); *United States v. Atkins* (8th Cir. 1973), 473 F.2d 308, 314, *cert. denied,* 412 U.S. 931, 93 S.Ct. 2751, 37 L.Ed.2d 160 (1973); *United States v. Fantuzzi* (2d Cir. 1972), 463 F.2d 683, 689, n. 7; *United States v. Agueci* (2d Cir. 1962), 310 F.2d 817, 828–29, *cert. denied,* 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963), and *Toliver v. United States* (9th Cir. 1955), 224 F.2d 742, 745.

■ Examination of the record in this case in the light of these principles leads us to conclude that there was sufficient evidence from which the jury could have found, beyond a reasonable doubt, that the substances involved in the incidents alleged in the indictments were illegal narcotics. We summarize below the pertinent evidence with respect to each count on which appellant was convicted.

■ Count one of Indictment 74–72–CH alleges that appellant traveled from West Virginia to Ohio in the Spring of 1972 with Bob Burgess, Randy Crank, and others, to buy lysergic acid diethylamide [LSD]. Burgess testified that on this trip two hundred tablets ("tabs") were purchased for $200 in cash. He described the devious manner in which the transaction was effected;[3] and he testified that in a discussion among appellant, Crank, himself and the others just prior to the transaction, the members of the group referred to the substance to be purchased as "LSD".

Crank, who indicated that he and others used the substance after returning to West Virginia, testified that it was three hundred "hits" of LSD in the form of little orange pills known as "orange sunshine" or "orange barrels." He also testified that while he did not actually see appellant take any of the "orange sunshine" while they were in Ohio, appellant must have done so because he was "tripping." Crank described "tripping" as "the hallucinations and such that you go through when you take LSD" and he stated that "[y]ou can tell anytime anybody is on LSD."[4] This evidence was sufficient to permit the jury to conclude that the substance purchased in Ohio was, beyond reasonable doubt, LSD as alleged in the indictment.

■ Count Five alleges that appellant, Steve Ware, Michael R. Brisendine and Joseph S. Bizek went to Michigan in January, 1974, to buy "phencyclidine, commonly known as 'PCP' or 'THC.'" Bizek and Ware testified that on this trip one ounce of a substance, to which members of the group referred as "THC," was purchased for $800 in cash. Bizek described the substance as a white crystal powder contained in a plastic sandwich bag. He testified that Brisendine tested the substance by "snorting" it[5] and then said that it was good.[6] Brisendine, who admitted that he had experience dealing in "THC," marijuana and LSD, testified that the substance was "crystal THC." The testimony of Keith Bailey indicated that participants in the transactions involved in this case used "THC" as a synonym for "PCP."[7] The jury could properly have

---

3. According to Burgess, the others asked him to carry out the purchase. While they remained at the house of someone known as "the Dutchman" in Dayton, he went with two unidentified men to another house where he gave them the cash. The two men left him alone at this second house and subsequently returned with the tablets which they called LSD.

4. Crank did not expressly state the extent to which he was familiar with LSD and its effects prior to this trip. While such testimony would have made the evidence much more conclusive, we do not believe that its absence is fatal to the government's case.

5. Another witness, Keith Bailey, testified that PCP, also known to him as "THC," was a hallucinogen which could be "snorted" (insufflated nasally), smoked or injected into a vein.

6. Bizek also testified that he and others "smoked some of the THC" in Brisendine's trailer after returning to West Virginia.

7. Although this usage varies from correct medical terminology (properly used, "THC" is an abbreviation for tetrahydracannibinol, the hallucinogenic agent in marijuana, which is not generally available on the illicit drug market), it is in accord with the practice of many of those who unlawfully deal in phencyclidine, *see* 24 *Bull. of the Hospital Pharmacy and the Drug Information Analysis Service* No. 2 (University of Calif., San Francisco, Feb., 1976) and Burns,

found this evidence sufficient to establish that the substance purchased on this trip was, in fact, PCP.[8]

■ Count Six alleges that in February, 1974, appellant, Rick Hardway,[9] Gene Robinson and Keith Bailey traveled from West Virginia to Michigan to buy heroin and marijuana. According to Hardway's testimony, $275 was paid in cash for one fourth of an ounce of heroin. Hardway testified that appellant tested the heroin and that, after doing so, he appeared to be "high," his eyes became glassy and his speech slowed. Bailey, who testified that he paid $90 in cash for approximately a gram of heroin, confirmed that appellant tested the heroin by injecting it into his veins. He stated that, after injecting the heroin, appellant said that "it was good."[10] Hardway testified that he tested the heroin himself and knew it to be good. This evidence was legally sufficient to establish that the substance was actually heroin.

■ The single count of Indictment 74–116–CH alleged that appellant, Gary Riddle, Jesse Lee Garrett, Jr., Terry Fink and Michael R. Brisendine traveled to Michigan in December, 1973, to buy lysergic acid di- ethylamide [LSD] and marijuana. Riddle testified that one thousand to two thousand little orange pills in a plastic bag were purchased on this trip. He stated that appellant took one or two of the pills, which "someone" said were LSD, and reported that they made him "high." Fink testified that the substance purchased was two or three thousand hits of mescaline; but he did not disclose the basis for his conclusion as to the identity of the drug. Brisendine, who, as stated above, had experience dealing in "THC," marijuana, and LSC, testified that $350 a thousand in cash was paid for the orange pills which he called "orange microdot." According to his testimony, orange microdot is also called orange barrels and is "either old LSD or mescaline." He further testified that LSD and mescaline are "the same thing," mescaline being "a mild form of LSD."[11] This evidence was sufficient to permit the jury to conclude that the substance purchased on this trip was either mescaline or LSD.

■ To the extent that proof that the substance purchased during the December, 1973, trip was either mescaline or LSD constitutes a variance from the indictment's unqualified allegation that the substance

Lerner, Corrado, James and Schnoll, *Phencyclidine: States of Acute Intoxication and Fatalities,* 123 *The Western Journal of Medicine,* 345, 346 (1975).

8. While Schedule III, 21 C.F.R. § 13.08.13, lists phencyclidine as a controlled substance, it does not indicate whether PCP is another name for phencyclidine and the government presented no evidence on the point. However, we take judicial notice that phencyclidine is commonly known as "PCP." *See* Rule 201(b) & (f), Fed.R. Evid. And *see,* e. g., Oral and Pratt, *The U. S. Dispensatory* (27th ed. 1973) (indicating that PCP is an abbreviation of phencyclidine) and 24 *Bull. of the Hospital Pharmacy and the Drug Information Analysis Service,* No. 2 (Univ. of Calif. at San Francisco, February, 1976) (same). *Cf.,* e. g., *United States v. Van Buren* (10th Cir. 1975), 513 F.2d 1327, 1328, *cert. denied,* 421 U.S. 1002, 95 S.Ct. 2402, 44 L.Ed.2d 670 (1975) (on appeal from conviction for unlawful distribution, court took judicial notice of fact that cocaine hydrochloride is a controlled substance, even though it is not listed by that name in the statute) and *United States v. Mills* (1972), 149 U.S.App.D.C. 345, 463 F.2d 291, 296, n. 27 (dictum to same effect).

9. Although the indictment alleges that Hardway traveled with appellant and the others from West Virginia to Michigan, the proof established that he lived in the Detroit area and was the group's contact there.

10. Bailey also testified that sometime after the return to West Virginia appellant repackaged the heroin in 10 bags for resale.

11. Technically, Brisendine's testimony on this point was not accurate. Mescaline is an alkaloid derived from the American peyote plant, *see,* e. g., Corder, Smith and Swisher, *Drug Abuse Prevention* 34 (1975); and LSD is d-lysergic acid diethylamide derived from a fungus found in various grasses, *id.* at 32. However, from the viewpoint of a drug abuser, Brisendine was quite correct. Mescaline and LSD are both hallucinogens with substantially similar effects, *see* e. g., Hoffer and Osmond, *The Hallucinogens,* 138–139 (1967) and LSD is the more potent of the two, *see,* e. g., Corder, Smith and Swisher, *supra,* 32–34 and S. Einstein, *The Use and Misuse of Drugs,* 37–39 (1970).

was LSD, such variance did not affect appellant's substantial rights and, therefore, reversal of his conviction is not warranted, *Berger v. United States* (1935), 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314; *United States v. Schrenzel* (8th Cir. 1972), 462 F.2d 765, 770, *cert. denied,* 409 U.S. 984, 93 S.Ct. 325, 34 L.Ed.2d 248 (1972) and *Rathbun v. United States* (10th Cir. 1956), 236 F.2d 514, 516, *aff'd,* 355 U.S. 107, 78 S.Ct. 161, 2 L.Ed.2d 134 (1957). The gist of the charge against appellant was that he traveled in interstate commerce to engage in an unlawful business enterprise involving a Schedule I controlled substance; and both mescaline and LSD are Schedule I controlled substances, 21 C.F.R. § 1308.11(d)(12) & (14). Thus, the indictment sufficiently informed the appellant of the substance of the offense for which he was convicted to enable him to prepare his defense; and the conviction in this case will be a bar to any other prosecution under 18 U.S.C. § 1952(a)(3) for the same conduct, *compare, e. g., United States v. Schrenzel, supra,* 769–771 (holding that a charge of an illegal sale of d and dl-amphetamine *sulfate* where the proof showed a sale of d and dl-amphetamine was not a fatal variance) and *Bronstein v. United States* (8th Cir. 1927), 17 F.2d 12, 14 (holding that a charge of an illegal sale of gin, when the proof showed a sale of moonshine whisky, was not a fatal variance).

Appellant also cites as error supplemental instructions which were given after the jury reported that it was unable to reach a verdict.[12] This claim is without merit. The supplemental charge was substantially similar to the "modified Allen charge" approved by this court in *United States v. Sawyers* (4th Cir. 1970), 423 F.2d 1335, 1342, n. 7. It was not erroneous.[13]

Because we find no prejudicial error, the judgments are

*AFFIRMED.*

WINTER, Circuit Judge (concurring and dissenting):

While I agree with the majority that there was sufficient evidence to convict Dolan of the charge alleged in Count Six of the indictment in No. 74–72–CH, I think it legally insufficient to support his convictions on Counts One and Five of that indictment and on the single count of the indictment in No. 74–116–CH. To that extent, I respectfully dissent.

## I.

In Count One of indictment No. 74–72–CH, Dolan and others were charged with travel to obtain "LSD" in the Spring of 1972 in Ohio. Bob Burgess testified that two unidentified individuals sold to him, the defendant, and others, what was represented by the sellers to be LSD. Burgess was

---

12. The supplemental charge about which appellant complains stated in pertinent part:

> [I]n order to return a verdict in this case, each juror must agree thereto. In other words, your verdict must be unanimous.
>
> In your deliberations jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment. Although each juror must decide the case for himself, this should only be one after an impartial consideration of the evidence with his fellow jurors.
>
> In the course of your deliberations a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous. Each juror who finds himself to be in the minority should reconsider his views in the light of the opinion of the jurors of the majority. Conversely, each juror finding himself in the majority should give equal consideration to the views of the minority.

> No juror should surrender his honest conviction as to the weight or effect of the evidence for his fellow jurors or for the purpose of determining a verdict.
>
> But remember also that after full deliberation and consideration of all the evidence it is your duty to agree upon a verdict if you can do so without violating your individual judgment and conscience.

13. Appellant also contends that the trial court's response to an inquiry by the jury was prejudicial. The jury was confused by the fact that marijuana and LSD were both Schedule I substances. In substance, the trial court informed the jury that the scheduling of various drugs was not a matter for its concern in reaching a verdict. It also indicated that marijuana and LSD had no medicinal use and that some other might be much worse but have a medicinal use. We find nothing in this interchange to warrant reversal of appellant's conviction.

asked, "What did you get?" He responded, "Two hundred hits of LSD." This is his only testimony about what drug was purchased.

Randall Crank testified to the same transaction. His testimony was as follows:

Q. What happened after you arrived in Dayton, Ohio?

A. We copped some LSD.

Q. How much LSD did you cop?

A. 300 hits.

. . . . .

Q. By copping LSD, you mean buying it or getting it?

A. Yes, sir.

Q. What kind of LSD was it?

A. Orange barrels.

Q. Orange barrels?

A. Yes, sir.

Q. What are orange barrels?

A. LSD.

Q. What do they look like?

A. They are just little orange pills.

Q. Orange pills?

A. Yes, sir.

Q. Orange pills. Is that the term you use for them?

A. We just called it sunshine.

Q. Sunshine. Orange sunshine.

A. Yes.

. . . . .

Q. Did you use any of it?

A. Yes, sir.

Q. Who did?

A. All of us.

Later, on cross-examination, the defense asked Crank if he had any personal knowledge that Dolan had received any of the LSD. He answered:

A. Yes, he was tripping.

Q. How do you know that?

A. You can tell anytime anybody is on LSD.

Q. Did you see anyone give him any LSD?

A. No, sir.

Q. Did you all take LSD over there? Did you?

A. No sir. We didn't eat ours till we got back in West Virginia.

Later, on redirect:

Q. What do you mean by tripping?

A. Tripping is the hallucinations and such that you go through when you take LSD.

This is all the evidence showing that the orange pills were LSD. I think it is legally insufficient to support that conclusion. All it shows is (1) the sellers said it was LSD; (2) it was in the form of orange pills; (3) based on the above information, two lay witnesses thought it was LSD; (4) one lay witness observed Dolan after the transaction in a state he thought was induced by a hallucinogenic drug; and (5) the witnesses used the substance when they got back to West Virginia. Completely lacking was any evidence that either of the witnesses took the drug *and* themselves experienced effects which they deemed to be those of LSD, and any evidence showing that either witness had any background of drug experience so that his conclusion that the substance ingested was LSD should be credited. Crank's testimony that Dolan was "tripping" fails to supply these omissions because (1) no showing was made why Crank had any reason to believe Dolan's behavior was drug-induced, i. e., there was no showing that Crank was experienced in dealing with those who were on "trips," (2) no showing was made as to any basis for Crank's belief that Dolan was "tripping" on LSD as opposed to some other drug, possibly a legal one, and (3) no showing was made (other than Crank's conjecture) that Dolan had taken one of the orange pills they had bought in Dayton, and that therefore his "tripping" should be attributed to the pills.

## II.

In Count Five of indictment No. 74–72–CH, Dolan and others were charged with interstate travel in January, 1974, to carry on a business enterprise in "phencyclidine, commonly known as 'PCP' or 'THC'." Phencyclidine is listed in the controlled substances schedule. PCP and THC are not

listed as such. Far from being a common name for phencyclidine, TCH is tetrahydrocannabinols, the active ingredient in marijuana. The record does not establish the nature of PCP, but it is reputedly hallucinogenic, whereas phencyclidine is listed in the controlled substances schedule as a depressant.

The record is absolutely silent as to whether or not PCP and THC are common names for phencyclidine. Even the most convincing testimony showing that the defendant dealt in "PCP" and "THC" would thus be unavailing to prove Dolan dealt in phencyclidine.

The testimony tending to support this count is as follows: Steven Ware testified that he, Dolan and others, bought one ounce of what he described as THC in Detroit. Joseph Bizek testified to the same transaction. He first stated that the purpose of the trip had been to buy some THC. He continued:

Q. What happened after you got over to the house?

A. We waited and finally the THC got there.

     .      .      .      .      .

Q. What did he do with the THC when he brought it?

A. Handed it to Dewayne [Dolan] and Mike tried it.

Q. How did Mike try it?

A. He snorted it.

Q. Mike snorted it?

A. Yes.

Q. What did Mike say about it?

A. He just laid back and said it was good.

Q. You said he handed it to Dewayne. Could you see what it was that he handed to Dewayne?

A. It was a bag—

Q. Go ahead.

A. It was a baggie with white powder crystals in it. It was almost half full, the baggie was.

Mike Brisendine testified to the same transaction. He stated that he, the defendant and others purchased "an ounce of crystal THC."

Keith Bailey testified that on a different trip to Detroit, he and the defendant attempted unsuccessfully to obtain some PCP. His testimony was apparently the source of the government's confusion of PCP, THC and phencyclidine:

Q. What is PCP to your knowledge?

A. THC. What is it? Hallucinogenic drug.

Q. Hallucinogen?

A. Yes.

Q. Similar to LSD?

A. Somewhat, yes, sir.

Q. How is it used?

A. You can inject it with a needle or snort it, smoke it.

Q. How do you snort it?

A. You roll up a bill or something of that nature.

Q. What?

A. A dollar bill or something like that and inhale through your nose.

Q. Or you can smoke it?

A. Yes, sir.

Q. And by smoke it what do you mean?

A. Say you put some PCP on a ball of marijuana and you smoke the marijuana and the substance is burned up through the marijuana.

Q. And by injecting it, what do you mean by that?

A. Use of a needle.

Q. In the arm or somewhere else?

A. A vein.

Q. Tell the jury what happened when you got to Detroit.

A. We couldn't obtain an ounce of PCP.

The only other reference in the transcript to PCP, THC or phencyclidine is found in the testimony of Harold Robinson who described another transaction in Detroit in which the defendant and others supposedly obtained "some heroin or THC, what I thought was THC with a heroin base." This transaction involving heroin took place in February 1974 and was the subject of Count Six. It is clearly a separate incident

from the alleged dealing in THC–PCP, etc., in Count Five.

The evidence thus establishes only that (1) the substance involved in the allegedly illicit transactions was represented by the sellers and believed by the buyers to be something called "THC"; (2) the substance was a white crystalline powder; and (3) one witness "snorted" it and said it was "good." Bailey's testimony establishes at best that there is a drug known as "PCP" which can be snorted, smoked or injected. His single reference to "THC" is apparently inadvertent. Totally lacking is any showing that any witness ingested the white crystalline powder and experienced effects he had reason to believe were similar to those of "THC." Even had such testimony been supplied, it would not have proved that THC is the same thing as the controlled substance phencyclidine, which was mentioned by no witness.

### III.

Indictment No. 74–116–CH charged interstate travel in December, 1973, to carry on an unlawful controlled substance business enterprise in lysergic acid diethylamide and marijuana. The evidence to support conviction of this charge follows:

Gary Riddle testified that he went with Dolan to Detroit to "purchase narcotics or dope or whatever it was." He continued:

Q. What kind of drugs were they?

A. Just orange pills. I don't know what kind it was.

Q. Did anyone take any of them?

A. Mr. Dolan took one or two.

Q. Did he say anything after he took them?

A. He said they were good.

Q. Did they affect him in any way?

A. He said he got high off of them, but I don't know whether he did or not.

Q. Do you know how many of those little orange pills there were?

A. Around a thousand or 2,000 of them.

Q. During the day before you secured these pills what kind of drugs had been discussed?

A. THC, I believe it was.

Q. Do you know whether that stuff you got there was THC or not?

A. I don't know what kind it was, just little orange pills. Someone said it was LSD. I'm not for sure.

Riddle then testified that he, the defendant and their companions purchased four ounces of marijuana while in Detroit. His only testimony as to what happened to this marijuana was that they all used it.

Mike Brisendine testified to the same transaction as Riddle involving the orange pills:

Q. Were you able to get some drugs?

A. Yes, sir.

Q. What kind of drugs?

A. Mescaline, microdot, orange microdot.

Q. Orange microdot and mescaline?

A. Yes, sir.

Q. How many?

A. Three thousand hits.

Terry Fink also testified to this transaction, describing the substance obtained as mescaline.

The evidence thus shows that the defendant and his friends obtained 1,000 or 2,000 or 3,000 orange pills which one witness heard someone say was LSD, which another described as mescaline and/or orange microdot, and which, so far as the record shows, no witness tested. Prior to obtaining the orange pills, THC had "been discussed." Manifestly, this testimony is not sufficient to prove beyond a reasonable doubt that the orange pills contained LSD, as charged in the indictment.

The indictment also charged dealing in marijuana. There is no evidence, other than witness Riddle's lay opinion, without articulated basis, that the substance purchased was in fact marijuana. I would nevertheless be inclined to call this evidence sufficient, on the theory that it is easier to tell that a grass-like substance is marijuana by looking at it and smoking it than it is to tell that orange pills are LSD or THC or PCP, etc., by looking at them and seeing somebody else "trip." On the other hand,

there is absolutely no evidence that the defendant or his accomplices did or intended to do anything with the marijuana other than smoke it themselves. There was apparently no plan to resell it, and four ounces is not a sufficient quantity to raise a presumption of such an intent. There is no testimony that they took it back to West Virginia. Thus, I do not think that the marijuana episode alone can support conviction on this count. To my mind, the statute on which the indictment is based requires some criminal intent to sell or distribute contraband, and not merely to purchase it for personal use.