802 F.2d 452
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Appellee,
v.
Emmanuel NWOLISE, Appellant.
 No. 85-5266.
 United States Court of Appeals, Fourth Circuit.
 Argued July 18, 1986.
Decided Oct. 3, 1986.
 
 Paul Michael Polansky and Abraham M. Dubno (Neil W. Steinhorn on brief), for appellant.
 Donna Helen Triptow (Breckinridge L. Willcox, United states Attorney, and Robert N. McDonald on brief), for appellee.
 D.Md.
 AFFIRMED.
 Before WINTER, Chief Judge, and MURNAGHAN and ERVIN, Circuit Judges.
 PER CURIAM:
 
 
 1
 Emmanuel Nwolise was convicted of possession of heroin with intent to distribute, in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2, and conspiracy to distribute heroin, in violation of 21 U.S.C. Sec. 846. He now appeals his conviction on grounds of insufficiency of the evidence. For both counts of the conviction, the record supports the finding of guilt beyond a reasonable doubt.
 
 
 2
 Emmanuel Nwolise ("Emmanuel"), a thirty-five year old Nigerian national, came to the United States in 1978 and settled in Baltimore. Soon thereafter, he was joined by his brother, Johnmark ("Johnmark"). Emmanuel was president of an import/ex port company called ENOL, and Johnmark served as a vice president. Emmanuel and Johnmark met one Felix Umah, another Nigerian who was studying in the United States. The two brothers convinced Umah to invest his college savings in their company, and to come and work for them during the summer. Umah readily agreed, and Emmanuel set him up in an apartment and paid his basic expenses. Emmanuel stored a locked suitcase in a closet in the apartment and regularly visited the apartment and shut him self in a bedroom with the suitcase. Even after he moved Umah into a larger apartment, Emmanuel continued to store the suitcase with Umah and to make frequent visits in order to have access to the suitcase. Eventually, Umah, out of curiosity, examined the valise himself and found that it was filled with eight small plastic bags, each knotted at the top and containing brown powder. When confronted with Umah's discovery, Emmanuel assured him that he would be safe, and claimed that he had been "doing this" for years. Emmanuel eventually removed the valise from Umah's apartment, but only after Umah assisted Emmanuel by fer rying individual bags over at the latter's request.
 
 
 3
 Emmanuel had other Nigerian friends stay at Umah's apartment. Umah walked into the bathroom by mistake during one visit and found the friend with several plastic bags of brown powder lying in the sink. The friend, nicknamed "Cossy," explained later that he had been strip searched at the airport, but that U.S. Customs officials had failed to find the bags. Umah also went with Emmanuel when he contacted one Charles Butler and, on another trip, one Otis Knight. On both occasions Emmanuel picked up large quantities of money in small denominations. Butler's house was raided and heroin testing paraphernalia was found, and testimony at trial established that Knight was a re tail heroin dealer.
 
 
 4
 Emmanuel's business generated a great deal of cash in small currency. On several occasions, he had Umah go to local banks to exchange between 93,000 and $9,000 in small bills for fifty and one-hundred dollar bills. Emmanuel told Umah that he was careful to exchange less than $10,000 in each transaction, since banks were required to report transactions of larger than $10,000. Nine bank tellers from six different bank branches confirmed that Emmanuel exchanged large quantities of cash in small denominations for larger denominations on a frequent basis.
 
 
 5
 Johnmark and Emmanuel fell under the suspicion of the Drug Enforcement Administration ("DEA"), and agents, posing as heroin dealers, managed to form a relationship with the brothers. Johnmark told them that he had large supplies of heroin, imported from Africa. Several sales were arranged, in increasing quantities. Umah was used as a courier in one of the transactions. The DEA agents eventually arranged a kilo sale with Johnmark, to take place in Los Angeles. The agents had no direct contact with Emmanuel, but phone records and surveillance established that the two brothers kept in constant touch during the three day negotiation with the agents. Emmanuel placed a call to the house (in Nigeria) of Ben Evolousha, the man who was to deliver the heroin, during this crucial time. Eventually, Johnmark flew to Los Angeles with Evolousha and the heroin, and was arrested, though Evolousha eluded capture. Umah was arrested for his involvement in the previous sale, while Emmanuel stayed free.
 
 
 6
 While in jail, Umah began talking to the authorities about the drug ring. Johnmark, newly traisferred to the Baltimore jail from a Los Angeles facility, ciiitioned Umah, and in his frequent contacts with Emmanuel, urged the latter to talk to Umah about remaining silent.
 
 
 7
 Johnmark and Emmanuel both testified on their own be half at trial. Neither could give satisfactory answers to questions about the nature of ENOL's business, the source of the tremendous quantities of cash, or why the income was treated in such a surreptitious manner. Umah testified at the trial as a government witness under a plea agreement. Upon conviction, Emmanuel was sentenced to thirty years in prison. Emmanuel argues on appeal that the government produced insufficient evidence to sustain the convictions. In considering whether a conviction is supported by sufficient evidence, we are bound to view the evidence in the light most favorable to the government, and to determine whether any rational trier of fact could reach a guilty verdict. United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir. 1982); United States v. Shaver, 651 F.2d 236, 238 (4th Cir. 1981), citing Jackson v. Virginia, 433 U.S. 307 (1979).
 
 
 8
 As to the conviction for possession, Emmanuel contends that the government failed to prove that the substance in his possession in 1984 was heroin. There was no chemical identification of the brown powder in bags seen by Umah at the time. However, "lay testimony and circumstantial evidence may be sufficient, without the introduction of the expert chemical analysis, to establish the identity of the substance involved in an alleged narcotics transaction." United States v. Dolan, 544 F.2d 1219, 1221 (4th Cir. 1976); United States v. Gregoris, 497 F.2d 1253, 1263 (4th Cir. 1974), cert. denied, 419 U.S. 1024 (1974). Any and all circumstantial evidence will do; such proof may include, among others, evidence of the physical appearance of the sub stance, evidence that the substance was sold for a high price in cash, and evidence that the substance was handled with secrecy and deviousness. Dolan, 544 F.2d at 1221.
 
 
 9
 Emmanuel's brown substance was described in detail by Umah. The powder resembled other substances subsequently sold by Johnmark and Umah and identified as heroin. Experts testified that the description of the substance matched descriptions of some forms of heroin. Testimony linked Emmanuel in large cash transactions with known heroin dealers. High prices were paid for the substance and the transactions were carried out with secrecy and deviousness. In all, there was sufficient evidence to support the conclusion that Emmanuel was possessed of a significant quantity of heroin during the period in question.
 
 
 10
 Emmanuel also challenges the sufficiency of evidence to support the conspiracy conviction. The gist of the crime of conspiracy is an agreement to effectuate a criminal act. United States v. Watkins, 662 F.2d 1090, 1096 (4th Cir. 1981), cert. denied, 455 U.S. 989 (1982); United States v. Laughman, 618 F.2d 1067, 1074 (4th Cir. 1980), cert. denied, 447 U.S. 925 (1980). The agreement need not be proven by direct evidence, but can be verified from the facts and circumstances of the case. Thus, when two or more persons act in concert to achieve an illegal end, conspiracy may be inferred. See, e.g., United States v. Alvarez, 548 F.2d 542 (5th Cir. 1977) (seven men working in concert to unload bales of marijuana properly convicted of conspiracy).
 
 
 11
 The argument that the evidence was insufficient is simply without merit. Appellant addresses individual items of evidence and demonstrates that each, alone, is insufficient to support the conviction. The evidence taken as a whole, however, leaves no doubt of Emmanuel's deep and continuing participation in a heroin dealing ring. Testimony from Umah established that Emmanuel stored the brown substance surreptitiously in large amounts, and that friends of Emmanuel brought the substance to him in quantity. A jury could easily infer from Umah's testimony regarding the quantity, nature and sources of the cash generated that Emmanuel sold the heroin. Evidence established Emmanuel's dealings with domestic heroin dealers and his collection of cash receipts from them, again in large amounts. Umah testified that Johnmark admitted to him that he had made a $21,000 "deal" for Emmanuel. Circumstantial evidence showed Emmanuel to be in close contact with Johnmark and with Ben Evolousha throughout the final deal for a kilo of heroin. Finally, Johnmark, Umah and Emmanuel had frequent contact, even after the arrest of the first two, and the two brothers discussed ways to persuade Umah to remain silent. The record as a whole supports the conclusion that Emmanuel acted in concert with several other conspirators to import and sell heroin in significant quantities.
 
 
 12
 In summation, there is ample evidence in the record to support conviction on both counts. The decision of the district court is therefore
 
 
 13
 AFFIRMED.