No. 67,677

STATE OF KANSAS, *Appellant,* v. JOHN D. CHAPMAN, *Appellee.*

(847 P.2d 1247)

Opinion filed March 5, 1993.

*C. Richard Comfort,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellant.

*Mike Sheahon,* of Barta, Kent & Sheahon, Chartered, of Salina, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: The State of Kansas appeals from the district court's dismissal of criminal charges against John D. Chapman. The complaint charged five counts which involved possession of controlled substances. The district magistrate judge declined to bind over Chapman on three counts; a fourth count later was dismissed for improper venue. The fifth count was dismissed because the State failed to comply with orders to file a written notice of election and to provide a bill of particulars. The State appeals pursuant to K.S.A. 22-3602(b)(1).

A five-count complaint was filed against Chapman in Ottawa County, Kansas. Counts I, II, and III charged, in the alternative, aiding and abetting possession with intent to sell methamphetamine or aiding and abetting possession with intent to deliver a simulated controlled substance. Count IV charged, in the alternative, sale of methamphetamine or aiding and abetting possession with intent to deliver a simulated controlled substance. Count V charged, in the alternative, possession of methamphetamine or possession of a simulated controlled substance.

As to Count I, Michael Porter testified at the preliminary hearing that he believed, based on the effect he experienced from ingesting it, that the substance he received from Chapman in April 1989 was methamphetamine. Porter received the substance from Chapman while in his car in front of a truck stop in Tonkawa, Oklahoma. Maurice Lee Heberly, Jr., was not in the car at the time. Porter estimated the amount at between one and two ounces. At the time he received the drugs from Chapman, Porter intended to sell some or all of the substance to Heberly, and he ultimately did sell some to Heberly. With the substance in their car, Porter and Heberly drove through Ottawa County on the way home to Glasco.

Heberly's testimony with regard to their meeting with Chapman in April 1989 substantially matched that of Porter. Heberly saw no money or drugs change hands. Porter told Heberly that he got the substance which he sold to Heberly from Chapman. After meeting with Chapman at the truck stop, Porter showed Heberly a Ziplock baggie of methamphetamine, which Heberly had not seen before the meeting. After leaving the truck stop, Porter and Heberly tried the substance. Based on his experience

with the drug, Heberly believed that the substance received from Chapman was methamphetamine. Heberly paid Porter $1,900 for one ounce of the substance, and Heberly re-sold it in ¹/₈-ounce quantities.

Porter testified that he had gotten controlled substances from Chapman for approximately two years before his own arrest. Heberly testified that he had been getting methamphetamine from Porter for approximately six to eight months before his arrest. Porter and Heberly were arrested at the same time, in August 1989, and convicted in Cloud County. Heberly was convicted of selling methamphetamine and Porter was convicted of possession with the intent to sell methamphetamine.

As to Count II, Heberly testified that he and Porter met Chapman in a hotel room in Wichita on June 27, 1989. With Heberly watching, Porter and Chapman sat at a table and exchanged $5,700 and four ounces of methamphetamine. Heberly, Porter, and Chapman tried the substance, and Heberly believed it to be methamphetamine. Porter and Heberly drove back to Glasco and passed through Ottawa County. During the drive home, Heberly agreed to buy one ounce of the substance for $1,850. Heberly re-sold the substance in ¹/₈-ounce quantities.

Porter's testimony with regard to the transaction on June 27, 1989, did not deviate materially from that of Heberly.

As to Count III, Heberly testified that on July 9, 1989, he and Porter met Chapman in Salina. Heberly worked on Chapman's car while Porter and Chapman sat in Porter's car. On their drive home, Porter showed Heberly a baggie and said that "he had picked up a couple more ounces of that meth." Porter sold an ounce of the substance to Heberly for $1,800. Heberly tried the substance and believed it to be methamphetamine. Heberly bought the substance from Porter for the purpose of re-selling it. Porter and Heberly passed through Ottawa County with the substance in their possession.

Porter's testimony with regard to the transaction on July 9, 1989, did not deviate materially from that of Heberly. In addition, Porter testified that he received some methamphetamine from Chapman while they sat in Porter's car and that he did not believe that he had given money to Chapman on that occasion. Porter said that "fronting" was his usual arrangement with Chapman. This practice

allowed Porter to pay for the drugs previously received when he picked up more.

As to Count IV, Porter testified that between July 1988 and April 1989 he had purchased drugs from Chapman every two to four weeks. He had purchased the drugs at Chapman's house in Minneapolis, Kansas, for the purpose of re-selling them. Minneapolis is in Ottawa County.

As to Count V, the complaint charges that between September and December of 1989 Chapman, who previously had been convicted of a drug offense, possessed a controlled substance. At the preliminary hearing, Randy Cantor was asked whether between September 1988 and December 1989 he ever used a substance identified as methamphetamine or "crank" or "crystal" in the presence of Chapman. Cantor testified that "there's one time that me and [Chapman] did a line together." Although he earlier had given a videotaped statement in which he specified the September 1988 to December 1989 period, at the preliminary hearing Cantor was unable to pin down the time. When asked "from whom [he] got" the substance, Cantor testified that "it was mine at that time." Cantor described the effect of the substance as a "pick me up . . . like you get from coffee." He said that it burned his nose when he snorted it, and that it looked like pep pills crushed up. When asked whether the substance he used with Chapman affected him the same as crank or crystal he used on other occasions, Cantor gave a qualified "yes." Cantor said he was living in Salina at the time of the preliminary hearing. He testified that he and Chapman "did the line" together in his garage, but he was not asked where that garage was located.

Following the preliminary hearing on October 15, 1991, the district magistrate judge filed his bindover order on November 1. He dismissed Counts I, III, and IV without comment. He concluded that Chapman should be bound over to the district court on Count II as it is stated in the complaint—in the alternative. He further concluded that "there is probable cause to believe that the crime of one count of possession of a stimulant, second time offender in violation of K.S.A. 1988 Supp. 65-4127b(a)(2), Class 'D' felony, has been committed." This is Count V without the alternative charge of possession of a simulated controlled substance.

On December 2, 1991, Chapman filed a motion to dismiss the charges on which he had been bound over. On December 13, Chap-

man filed a motion for a bill of particulars for Count V. He requested that the State be required to state more precisely the time and place of the alleged offense so that he could prepare his defense.

There was a hearing on December 17, and on December 23 the district court judge filed a journal entry dismissing Count II on the ground that proper venue was in Cloud County. Count V was treated by the district court as if Chapman had been bound over on the alternative charges. In this regard, the final paragraph of the district court's order stated:

"IT IS FURTHER ORDERED that the State shall file with the Court and serve upon defense counsel on or before January 15, 1992, a written notice of election on Count V, second offense possession of stimulant or alternatively possession of a simulated controlled substance. Failure to file such election as directed will result in the dismissal of Count V."

On January 21, 1992, Chapman filed another motion to dismiss Count V. The basis for the requested dismissal was the State's failure to supply a bill of particulars. Chapman stated that "on December 10 [sic — correct date is 17], 1991, the Court granted the defendant's motion for Bill of Particulars as it relates to Count V, and ordered the State to file a Bill of Particulars by January 15, 1992." Chapman further stated that his motion is "independent of the Court's own ruling requiring the State to file a written Notice of Election on Count V prior to January 15, 1992." The transcript of the December 17 hearing contains the following ruling by the district court judge on Chapman's motion for a bill of particulars:

"Well, I'll sustain the motion for bill of particulars so that that can be— that can be progressing. I read the transcript of the cited, at least the portion of Mr. Cantor's testimony. It would appear to have a rather broad time frame there. You need to pin it down substantially more than that."

The State failed to respond or comply with the district court's order to supply a bill of particulars.

With regard to the district court's order to file a written notice of election on the alternative charges in Count V of the complaint, the prosecutor stated this position: "[W]e disagree with the Court's order. We don't feel that we have to make the election required. So that's our response." It had chosen to disregard the order and appeal the dismissal. The district court ordered that Count V be dismissed on the dual grounds that the alternative

charges were impermissible and as a sanction for the State's failure to comply with the court's orders to file a written notice of election and to furnish a bill of particulars.

We first consider if venue is proper in Ottawa County for Counts I, II, and III of the complaint. K.S.A. 22-2602 provides: "Except as otherwise provided by law, the prosecution shall be in the county where the crime was committed." K.S.A. 22-2607(1) provides: "A person who intentionally aids, abets, advises, counsels or procures another to commit a crime may be prosecuted in any county where any of such acts were performed or in the county where the principal crime was committed." The Judicial Council note on 22-2607 states: "This section relates to prosecutions under §§ 21-3205 and 21-3812 of the Criminal Code and places venue in either the county where assistance is rendered or the county of the principal crime." Chapman is charged under K.S.A. 21-3205 with criminal responsibility for the crime of possession with intent to sell methamphetamine which was committed by Porter and Heberly.

The State argues that Chapman has been charged in the county where the principal crime was committed. The State theorizes that Porter and Heberly's possession with intent to sell methamphetamine was a continuing crime which was committed in each county in which they made an appearance or through which they passed while possessing with intent to sell the methamphetamine acquired from Chapman.

Pursuant to the State's argument, when Porter and Heberly allegedly got methamphetamine from Chapman in Tonkawa, Oklahoma, Wichita, and Salina, Chapman could have been charged in any Kansas county through which the pair drove on their way home to Cloud County. In each instance, they drove through Ottawa County without stopping.

The State relies on federal cases for the proposition that any county entered by Porter and Heberly is a place where the crime was committed, the basic premise being that drug trafficking tends to be a continuing and transitory offense. In particular, the State cites *United States v. Brantley,* 733 F.2d 1429 (11th Cir. 1984), *cert. denied* 470 U.S. 1006 (1985), and *United States v. Jackson,* 482 F.2d 1167 (10th Cir. 1973), *cert. denied* 414 U.S. 1159 (1974). Jackson was charged with importation of heroin or

aiding and abetting importation of heroin and with conspiracy to import heroin. 482 F.2d at 1170. There is no specific federal statute fixing venue in importation cases. 482 F.2d at 1178. Jackson, who had been charged in the district of Colorado, argued that the crime of importation was complete when the heroin was discovered in California. 482 F.2d at 1178. The Court of Appeals disagreed:

"It was a continuous crime which received no finality until the package arrived at Lowry Air Force Base [in Colorado]. Since an offense committed in more than one district 'may be inquired of and prosecuted in any district [in] which such offense was . . . continued,' 18 U.S.C. § 3237, venue for [importation of heroin] lies in any district used by appellants to complete their crime. [Citation omitted.] . . .

"It necessarily follows that as the substantive crime was committed in Colorado, the crime for aiding and abetting may also be tried in that district." 482 F.2d at 1178-79.

Brantley was the navigator of a boat which left from Georgia, picked up about 500 bales of marijuana from off another boat near the Anguilla Banks, unloaded the marijuana in South Carolina, and returned to Georgia. 733 F.2d at 1433. A truckload of the marijuana was driven from South Carolina to Georgia, and the mastermind of the scheme remained in Georgia during the operation. 733 F.2d at 1433 and 1434 n.8. Brantley was charged with possession of marijuana with intent to distribute or aiding and abetting possession of marijuana with intent to distribute. 733 F.2d at 1433-34. He argued that the crime did not take place in the district of Georgia, where he was prosecuted. 733 F.2d at 1433. The Court of Appeals disagreed on the grounds that the truck driver had actual possession in Georgia and the mastermind had control, and thus constructive possession, in Georgia of the marijuana which had been transported in the boat to South Carolina. 733 F.2d at 1434 n.8. Brantley contended that his connection with the enterprise was severed with the unloading of the boat. The Court of Appeals rejected the contention because Brantley knowingly aided the possessors by supplying them with marijuana, because Brantley shared criminal intent with the possessors for the ultimate distribution of the marijuana, and because Brantley had a continuing interest in the success of the distribution on which his "compensation" depended. 733 F.2d at 1435.

We find the reasoning in *Jackson* and *Brantley* to be persuasive. However, these federal cases do not involve the question whether Porter and Heberly's driving through a county without stopping affects the determination where the crime took place. In this regard, the State cited *Marsh v. State*, 95 N.M. 224, 620 P.2d 878 (1980).

*Marsh* involved the question of venue for possession of marijuana which had been flown over Valencia County enroute to McKinley County, where it had been unloaded. The New Mexico Supreme Court concluded that venue was proper in Valencia County "because a 'material element' of the crime was committed in Valencia County, and where there is a continuing crime, venue lies in any county through which the defendant travelled." 95 N.M. at 226. Nonetheless, the court held:

"[I]t would be more appropriate to try the case, if at all, in McKinley County where there is a more substantial nexus between the criminal acts and the county. Under the facts of this case, where the only contact with Valencia County was the passage of the airplane carrying the marijuana over it, we invoke our superintending powers over inferior courts to direct the District Court of Valencia County to transfer the case so that it can be tried, if at all, in McKinley County. N.M. Const., Art. VI, § 3. The facts that the marijuana was physically located in McKinley County, that defendant Marsh flew his plane carrying the illegal drug there to meet with defendant Bass, and that the alleged conspiracy ended there support our conclusion." 95 N.M. at 226.

In the present case, neither the district court nor the defendant has cited any authority which would require that the aider be prosecuted where the principal was prosecuted. Chapman contends that in the cases relied on by the State the principals and defendants held criminally responsible for assisting them were prosecuted in the same locations. Assuming that his contention is correct, it does not necessarily follow that there is any requirement that principals and aiders be charged in the same place. Such a requirement might in some cases work to the disadvantage rather than to the advantage of a defendant. The federal constitutional venue requirements, at least, were intended to protect the "accused against the hardship and unfairness incident to a trial conducted in a remote place." *Jackson*, 482 F.2d at 1178.

Because Chapman is charged with aiding and abetting Porter and Heberly's possession with intent to sell methamphetamine rather than with sale or delivery of methamphetamine, prosecution is not confined to the county in which the drug passed from Chapman's hands into Porter's hands. K.S.A. 22-2607 does not require prosecution in the county in which the assistance was rendered. Moreover, it is not necessary under Kansas law that Chapman have been present within the state or county at the time of the commission of the crime with which he is charged with criminal responsibility. *State v. Wolkow,* 110 Kan. 722, Syl. ¶ 4, 205 Pac. 639 (1922).

The concept of aiding and abetting in Kansas allows any person who aids and abets in the commission of any offense to be charged, tried, and convicted as if he or she were a principal. *State v. Smolin,* 221 Kan. 149, 152, 557 P.2d 1241 (1976). Further, if charged only with the substantive offense, a defendant may be convicted on an aiding and abetting theory. 221 Kan. at 152. The defendant's participation, not the commission of the substantive offense, is the act which constitutes aid to the principal.

Here, the offense of possession with the intent to sell methamphetamine was not completed when Chapman supplied the drugs to Porter. Chapman shared criminal intent with Porter and Heberly for the ultimate distribution of the drugs, and Chapman had a continuing interest in the success of the distribution because his financial reward depended on it. Porter and Heberly's possession with the intent to sell did not commence and end upon Chapman's supplying the drugs to Porter. It was a continuing offense which was committed in each county they subsequently traveled through in reaching their final destination. Accordingly, pursuant to K.S.A. 22-2607(1), venue in Ottawa County is proper.

We next consider if there is sufficient evidence to support a probable cause finding as to Counts I, III, and IV. The district magistrate judge dismissed Counts I and III after preliminary examination. No reasons were stated. The State, through a process of elimination, concluded that the reason was that Heberly did not witness the transfer of methamphetamine from Chapman to Porter in the transactions which form the bases of Counts I and III. The evidence as to the three counts was the same, with

the exception of the location and that Heberly did not personally witness the exchange of the drugs and money. With regard to Count I, Heberly testified that he was in the truck stop in Tonkawa, Oklahoma, while Chapman and Porter met in a car. With regard to Count III, Heberly testified that he was working on Chapman's car while Chapman and Porter met in another car. Heberly said that he saw Chapman and Porter exchange money and drugs in a hotel room in Wichita, which is the transaction underlying Count II.

As the State points out, there was other evidence of Chapman's involvement in Counts I and III. Porter testified that Chapman supplied methamphetamine (or a substance with a like effect) to him on the dates and in the places charged in Counts I and III. The State also cites the following circumstantial evidence of varying degrees of probity:

> Heberly testified that Porter did not have large quantities of methamphetamine with him on the way to meet Chapman in Oklahoma, but did have large quantities of the drug after the meeting. Heberly testified that neither he nor Porter used any drugs on the way to the Salina meeting and that Porter did not indicate that he had any with him. After the meeting, Porter showed Heberly a bag of methamphetamine.

> Heberly testified that he witnessed Chapman and Porter exchange money and drugs on one occasion, that being the basis of Count II.

> For the purpose of Count III, it can be inferred from Heberly's witnessing the exchange that Chapman and Porter had an established business relationship.

The State contends that the evidence was sufficient to show that the alleged crimes had been committed and that there was probable cause that the defendant committed them. The function of the magistrate at the preliminary hearing is limited to making these determinations, and nothing more need be shown. *State v. Boone,* 218 Kan. 482, 485, 543 P.2d 945 (1975), *cert. denied* 425 U.S. 915 (1976).

Chapman argues that the evidence adduced at the preliminary hearing fell short of the mark. Deficiencies which he identifies include the following: Porter's and Heberly's questionable cred-

ibility due to agreements with the State on their own convictions; lack of physical evidence; Porter and Heberly did not stop in Ottawa County; Heberly's lack of contact with Chapman; and lack of foreseeability that Porter and Heberly would possess with intent to sell methamphetamine in Ottawa County.

Research does not disclose many cases in which the credibility of witnesses at the preliminary examination remains an issue by the time the matter reaches an appellate court. In *State v. Jones*, 233 Kan. 170, 174, 660 P.2d 965 (1983), the court stated that the magistrate's duties at a preliminary examination include passing judgment on the credibility and competency of witnesses. The question in *Jones* involved the defendant's presentation at the preliminary hearing of evidence he acted in self-defense. The court stated that the magistrate was to seriously consider the defense, but concluded that the defendant should not be discharged on the basis of conflicts between his evidence and the State's evidence. 233 Kan. at 174. "Where there is a conflict in testimony, a question of fact exists for the jury, and the magistrate must draw the inference favorable to the prosecution." 233 Kan. at 174.

In the present case, the evidence at the preliminary examination was adduced by the State, and the bulk of it was the testimony of two convicted felons who may have hoped to lighten their own punishments by testifying against Chapman. It was the magistrate's duty to assess their credibility. If the reasoning of *Jones* is followed, the court would not require the magistrate to discharge Chapman due to doubts about the witnesses' credibility as long as the doubts did not obviate the appearance that he probably committed the felony with which he was charged. 233 Kan. at 173-74. The following statement of the applicable principle appears in *Jones*: "At the preliminary examination when there is a conflict in testimony, a question of fact exists for the jury, and the magistrate must draw the inference favorable to the prosecution." 233 Kan. 170, Syl. ¶ 4.

In *Jones*, the State appealed the dismissal of a criminal complaint of aggravated battery at the close of the preliminary hearing. The State presented evidence of Jones being the aggressor; Jones presented evidence that he acted in self-defense. The magistrate dismissed the charges because he was not convinced by

the evidence that Jones was not using reasonable force in protecting himself from attack. This court reversed and remanded with directions to reinstate the complaint on the ground that the evidence was sufficient to support a probable cause finding.

Chapman also questions the lack of physical evidence. None of the substance possessed by Porter and/or Heberly was introduced, nor was evidence of its chemical composition as determined by laboratory analysis introduced. The State defends its evidence by quoting from *State v. Buckland,* 245 Kan. 132, 140, 777 P.2d 745 (1989), " '[E]ven the gravest offense may be sustained by circumstantial evidence' " (quoting *State v. Burton,* 235 Kan. 472, 478, 681 P.2d 646 [1984]).

The Court of Appeals recently affirmed drug convictions based on lay testimony and circumstantial evidence as to the identity of controlled substances. *State v. Northrup,* 16 Kan. App. 2d 443, 825 P.2d 174, *rev. denied* 250 Kan. 807 (1992). The convictions were based on evidence of two controlled purchases by Leslie Bowley, one of marijuana and one of methamphetamine. The marijuana was not subjected to laboratory analysis; the methamphetamine was. There was no exhibit admitted at trial which was identified as the marijuana.

Bowley testified that he asked to purchase some marijuana from defendant Northrup, who sold him a bag of green vegetation. 16 Kan. App. 2d at 450-51. A detective testified that it looked to him like marijuana. 16 Kan. App. 2d at 451. The defendant testified that "Bowley asked for marijuana, that he told Bowley that he would sell him marijuana, and that he would not 'to my knowledge' get him something that was not marijuana." 16 Kan. App. 2d at 452.

The Court of Appeals concluded that the evidence was "sufficient to convince the jury, beyond a reasonable doubt, that the defendant sold marijuana to Bowley." 16 Kan. App. 2d at 452. The Court of Appeals noted that "there was absolutely no evidence to suggest it could have been anything else." 16 Kan. App. 2d at 452.

In reaching its conclusion, the Court of Appeals reviewed decisions from 23 other states and from 6 federal circuits which had sustained the proposition that the identity of substances such as marijuana may be proven by circumstantial evidence. 16 Kan.

App. 2d at 448-49. It singled out *United States v. Dolan*, 544 F.2d 1219 (4th Cir. 1976), as a leading case and quoted from it as follows:

" 'Such circumstantial proof may include evidence of the physical appearance of the substance involved in the transaction, evidence that the substance produced the expected effects when sampled by someone familiar with the illicit drug, evidence that the substance was used in the same manner as the illicit drug, testimony that a high price was paid in cash for the substance, evidence that transactions involving the substance were carried on with secrecy or deviousness, and evidence that the substance was called by the name of the illegal narcotic by the defendant or others in his presence. [Citations omitted.]' 544 F.2d at 1221." 16 Kan. App. 2d at 453.

Many of the elements of the circumstantial proof at issue in *Dolan* also appear in the present case with regard to the three instances when Porter and Heberly met Chapman. Thus, the evidence of the identity of the substance presented to the magistrate in the present case is sufficient for the purpose of binding Chapman over on Counts I and III of the complaint.

Count IV is based on Porter's testimony that every few weeks between July 1988 and April 1989 he purchased drugs from Chapman at Chapman's house. Here is Porter's testimony on direct examination with regard to the identity of the substance(s):

"Q. Okay. And did he represent uh on these occasions when you purchased methamphetamine from him that you were purchasing the drug methamphetamine?

"A. Yes, that's what I presumed.

"Q. Okay, you [*sic*] didn't tell you that you were buying a comet, dish soap or crank.

"A. No.

"Q. Excuse me, or crack or cocaine or any derivative or designer drug, did he?

"A. No.

"Q. Have you ever tried any of those other drugs?

"A. No.

. . . .

"Q. Okay. And do you recall what uh the price were, let's say a half an ounce would have been?

"A. Seems to be around 9.

"Q. $900 dollars?

"A. Yes."

On cross-examination, Porter testified as follows:

"A. [answering question regarding what some drug looked like]: It was [a] white powder.

"Q. Likewise Mr. Porter at any time did you have chemical analysis done on any of that powder?

"A. No I didn't.

"Q. Did you, do you have a sample that we can prove that it was drugs?

"A. No I don't.

"Q. Do you know if the State has a sample that we can prove that that [sic] it's [an] illegal substance?

"A. I believe Cloud County does have.

"Q. Do you know if Ottawa County has a sample of that same drugs that [you're] testifying to from July '88 through April '89?

"A. Not to my knowledge."

On re-direct, Porter testified:

"Q. What did he represent to you that it was?

"A. Methamphetamine.

"Q. And what did you pay him for?

"A. Methamphetamine.

"Q. Okay. You said that uh Cloud County, Kansas, has a sample, what do you mean by that?

"A. Well, I presume they still have it. That's what, what they confiscated from me when I was arrested.

"Q. Okay. Was that tested?

"A. I be, yes it was.

"Q. And do you know what the results were or were you told what the results were?

. . . .

"Q. Were you told what the substance was tested as being?

"A. Yes.

"Q. And what were you told?

"A. I was told it was methamphetamine.

"Q. Okay, and where did you get that drug?

"A. From John Chapman."

There is evidence of the physical appearance of the drug, that it was expensive, that Porter had requested methamphetamine, that Chapman referred to the substance as methamphetamine, and that Porter had been informed that laboratory analysis showed the substance to be methamphetamine. This circumstantial proof is sufficient for the purpose of the preliminary examination.

The following excerpt from *State v. Jones,* 233 Kan. 170, sets forth other basic principles applicable to consideration of the sufficiency of the evidence at a preliminary examination:

"A preliminary examination differs from a trial. This court stated in *In re Mortimer,* 192 Kan. 164, 166, 386 P.2d 261 (1963):

" ' There is a difference between the quantum of proof essential to a binding over for trial and that required to convict at the trial. The guilt or innocence of a defendant is not adjudged at a preliminary examination, and it is not necessary that evidence upon which a defendant is held for trial should be sufficient to support a conviction. It is enough if it shows that an offense has been committed and that there is probable cause to believe the defendant is guilty.'

"In the recent case of *State v. Hunter,* 232 Kan. 853, 854, 658 P.2d 1050 (1983), Justice Miller stated:

" ' The reasonable doubt test has no place in a preliminary examination. As we have said many times, a magistrate conducting a preliminary examination serves a limited function: to determine whether it appears that a felony has been committed, and whether there is probable cause to believe that the accused committed it. It is an inquiry as to whether the defendant should be held for trial.' " 233 Kan. at 172-73.

Probable cause at a preliminary hearing signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. *State v. Starks,* 249 Kan. 516, Syl. ¶ 2, 820 P.2d 1243 (1991). In our judgment, the evidence was sufficient to find probable cause that the defendant committed the offenses charged in Counts I, III, and IV.

Finally, we consider the district court's dismissal of Count V. The State has framed two issues around the dismissal of Count V. First, the State objects to the district court's requiring it to elect between the alternative charges. Second, the State complains of being required to file a bill of particulars.

However, before we consider these issues, there is a question of venue which must be addressed. Counsel for the State, when asked at oral argument what evidence was presented at the preliminary examination to establish that the offense occurred in Ottawa County, responded by directing the court to paragraph 26 of Sheriff White's affidavit, dated July 18, 1990. The affidavit was filed on that day together with the complaint and warrant for the defendant's arrest. Sheriff White states in paragraph 26: " That during the fall and winter of 1989, Randall Cantor, has indicated to this reporting officer that John D. Chapman set out lines of what he believed to be methamphetamine on a table in Mr. Cantor's garage located at 222 Laurel, City of Minneapolis,

Ottawa County, Kansas." However, there is no evidence in the record of the preliminary hearing to that effect. Randy Cantor testified that he and Chapman used a stimulant drug together in Cantor's garage. The only location about which Cantor testified was his residence in Salina, Kansas. That would be in Saline County. Although not entirely clear, it appears that Chapman was living with Cantor at the time. Cantor's testimony does not reveal any evidence that the offense charged in Count V occurred in Ottawa County. As to Count V, Sheriff White testified on direct examination:

"Q. Alright [*sic*]. With regard to uh Count V, did you also have Randy Cantor under investigation and have his house under surveillance?
"A. Yes sir, we did.
"Q. And did you see Mr. Chapman at that location?
"A. Numerous times.
"Q. And was that fairly frequently?
"A. Yes sir, it was."

On cross-examination, the following exchange took place:

"Q. Where did he live at that time? [Referring to Chapman.]
"A. Two residences, one was uh if I remember the address is correct, the address is 813 Elm Street, which is located just west of the hospital, uh, and the other one was I think 707 North Rothsay which is a house that his father owned. He had resided in both of them.
"Q. Alright [*sic*] during that period of time, did your investigation reveal that he was separated from his wife?
"A. Yes sir, it did.
"Q. Did it reveal that he was living at uh, this Cantor's house for some period of time?
"A. He was staying down at Cantor's off and on, but when he moved out of the Elm Street house, he went over to the Rothsay house.
"Q. So it showed that he was uh, he did move into Cantor's house for some time?
"A. He was stayin' down there off and on.
"Q. Okay."

Sheriff White was not asked nor did he state where Cantor was residing at the time the alleged use of methamphetamine occurred. The magistrate was not presented with any evidence that the offense described in Count V of the complaint occurred in Ottawa County. In *Jones,* we said: "The quality of the evidence to obtain the complaint/information is no longer sufficient during the preliminary examination. Only evidence admissible in the trial

of the defendant is to be considered by the magistrate." 233 Kan. at 172. It is solely from that evidence that the magistrate must determine that a felony has been committed and that there is probable cause to believe the defendant committed it. In *State v. Myatt*, 237 Kan. 17, 30, 697 P.2d 836 (1985), this court stated: "The venue of an offense is jurisdictional. The State must prove that the offense occurred in the county where it is prosecuted." Here, the State failed to establish that the offense charged in Count V occurred in Ottawa County.

The dismissal by the trial court of Count V of the complaint is affirmed. We reverse as to Counts I, II, III, and IV, and the case is remanded with directions to reinstate those counts against the defendant, to arraign him, and to proceed in conformity with this opinion.

ABBOTT, J., concurring and dissenting: I concur with the majority in regard to Counts IV and V.

I want to emphasize I view our decision concerning Counts I, II, and III very narrowly. If Porter's testimony is believed, the defendant wholesaled drugs to Porter. He did so on credit (fronted), *i.e.*, the evidence is such a jury could find beyond a reasonable doubt on Counts I, II, and III that the defendant furnished the drugs to Porter with the understanding Porter would sell the drugs and then pay the defendant. The defendant retained a financial interest in the resale. Thus, the defendant would be aware the drugs were in Porter's possession with the intent to sell because of the fronting arrangement and because of the quantity of the drugs turned over to Porter. According to Porter, sales took place every two to four weeks over an extended period of time.

Porter fronted the drugs to Heberly in smaller quantities than he obtained from the defendant. Heberly then sold the drugs and paid Porter. As a result, I find venue and jurisdiction in Ottawa County even though the record indicates that, with regard to Counts I, II, and III, the only contact with Ottawa County was when Porter and Heberly drove through the county on Interstate 135 without stopping and with no discussion concerning the drugs that were in the vehicle.

I have reservations about our review of this case, and it is for the following reason I dissent. The trial judge did not have a court reporter or a certified recording device available and, with the consent of the attorneys, used an unapproved recorder. The recorder reached the end of the tape and shut off during the hearing. As a result, no record was made of the trial judge's reasoning.

No effort was made to give the trial judge an opportunity to explain his reasoning on the record. It is the appellant's responsibility to furnish an adequate record on appeal. The failure to do so is fatal on appeal. Assertions in an appellate brief are not sufficient to satisfy inadequacies in the record on appeal. *State v. Dunn,* 249 Kan. 488, 496, 820 P.2d 412 (1991).

We have followed the State's lead and set up a "straw dummy," knocked it down by first speculating what the trial judge must have reasoned, and then delivered the knockout blow by adding our speculations to those of the county attorney about what the problem was.

We do not know what the trial judge's reasoning was. He was faced with a case that was two years old when he heard it. The State's two witnesses, Porter and Heberly, had been caught red-handed possessing and dealing drugs. They were told the defendant was targeted, and if they would testify against him, some potential charges would be dropped and they would receive favorable sentence considerations for agreeing to testify. Heberly witnessed one drug sale between the defendant and Porter, but did not witness the other two transactions. Heberly had no conversations with the defendant concerning drugs, and there is no evidence the defendant knew Porter was selling drugs to Heberly. (The only significance to the above comments concerning Heberly is to illustrate it was Porter's testimony, not Heberly's, that was crucial to the State's case.) The trial court may have disbelieved Porter's and Heberly's testimony. In addition, no drugs involved in this case were recovered, and Heberly conceded there were legal drugs available that caused a similar reaction to a user and could be made to resemble methamphetamine.

The record before us is inadequate. Because the State in this case bears the responsibility of furnishing an adequate record to

demonstrate error, I am unwilling to reverse the trial judge on Counts I, II, and III.