998 F.2d 1010
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Tyrone CLARK, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Anthony FORD, Defendant-Appellant.
 Nos. 92-5480, 92-5494.
 United States Court of Appeals,
Fourth Circuit.
 Argued: April 2, 1993.
Decided: July 15, 1993.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. John R. Hargrove, District Judge. (CR-91-310-HAR)
 ARGUED: Howard L. Cardin, CARDIN & GITOMER, Baltimore, Maryland, for Appellant Clark;
 Isaac Joe, Jr., Baltimore, Maryland, for Appellant Ford.
 Debra Ann Carr, Assistant United States Attorney, Baltimore, Maryland, for Appellee.
 ON BRIEF: Mark A. Gitomer, CARDIN & GITOMER, Baltimore, Maryland, for Appellant Clark. Richard D. Bennett, United States Attorney, Baltimore, Maryland, for Appellee.
 D.Md.
 AFFIRMED.
 Before NIEMEYER and WILLIAMS, Circuit Judges, and SPROUSE, Senior Circuit Judges.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 Tyrone Clark and Anthony Ford were convicted of conspiracy to distribute and possess with intent to distribute a kilogram or more of heroin, from January 1990 through July 1, 1991, in violation of 21 U.S.C. § 846, and possession with intent to distribute 100 grams or more of heroin, on or about September 29, 1990, in violation of 21 U.S.C. § 841(a)(1). Clark was also convicted on two counts of using and carrying a firearm during and in relation to drug trafficking crimes, on or about October 11, 1990 and July 1, 1991, in violation of 18 U.S.C. § 924(c), and on one count of being a felon in possession of a firearm, on July 1, 1991, in violation of 18 U.S.C. § 922(g). Clark was sentenced to 40 years imprisonment and Ford to 25 years. In this appeal, they challenge numerous aspects of their trial and sentencing. For the reasons that follow, we affirm.
 
 
 2
 * Prior to trial, Ford moved for severance and the district court denied the motion. Contending that the refusal constituted an abuse of the court's discretion, Ford argues that he was unfairly prejudiced because of "the cumulative effect of extensive and highly inflammatory evidence introduced against his co-defendant Tyrone Clark." This evidence largely was in the form of testimony by the government's principal witness, Raymond Obilo.
 
 
 3
 Ford argues that he was prejudiced by the introduction of Obilo's testimony concerning drug negotiations and transactions which took place when Ford was not present, testimony regarding Clark's flamboyant lifestyle, and testimony which suggested that Clark may have been involved in the shooting death of a person named "Lucky." Ford further complains that he was prejudiced by the testimony of two law enforcement officers concerning Clark's possession of handguns. Special Agent Wilbert Plummer testified that, upon entering Clark's apartment with Emmanuel Anudu on October 11, 1990, he found Clark "pointing a [.357] revolver at us." Agent Plummer stated that Clark subsequently put the gun down, and the three men discussed drugs and money. Special Agent Terrance Mortimer of the Bureau of Alcohol, Tobacco, and Firearms testified that a Glock .40 handgun was seized during the execution of a search warrant at Clark's apartment on July 1, 1991. Ford contends that he was unfairly prejudiced by Plummer's and Mortimer's testimony, because "the record is devoid of any testimony or even a suggestion that Ford owned any kind of weapon, or knew of Clark's use of one."
 
 
 4
 With respect to the alleged prejudicial testimony about Clark, we note that Ford was closely connected to Clark and that the testimony was therefore properly directed as much at the characteristics of this conspiracy as at Clark's individual behavior. Obilo testified that he first became involved in the heroin trade in 1988, and in September or October of 1989 he met Clark, who told Obilo that he had $100,000 and wished to spend it on heroin. Ford was present at the meeting. A week later, Clark and Obilo met again, with Ford again present, when Obilo stated that he was unable to get his New York source to deliver heroin to Maryland. Since Clark was unwilling to make the trip to New York to purchase the drugs, he suggested that Obilo meet his partner, "Lucky." Obilo testified that he later met Lucky and sold him a kilogram of heroin in two separate transactions. Shortly thereafter, Lucky was killed. Obilo stated that Clark told him that Clark and Lucky had engaged in a "shoot-out."
 
 
 5
 Two or three weeks later, Tyrone Clark contacted Obilo and arranged a meeting in January 1990 between the two men, at which Ford was again present. At that meeting, it was agreed that Clark would begin dealing with Obilo in the same fashion as had Lucky. A purchase of 300 grams of heroin for $56,000 was arranged and later consummated, this too in Ford's presence. After Clark paid Obilo the $56,000, Obilo gave him another 400 grams of heroin, on credit.
 
 
 6
 About a week later, in February 1990, Ford and Clark paid Obilo a portion of the money they owed him for the heroin. Obilo testified that "Anthony Ford went downstairs with Tyronne's instructions. He went to the trunk of the car, picked up the money, came up to the apartment, and handed it to me. He was actually passing it to Clark. Then Clark said 'Give it to him. It's okay.' " Ford was present throughout this entire meeting. Obilo further testified that Clark had informed him that Ford was Clark's partner and "watches his back." Obilo also stated "[a] couple of times when I can't get in touch with Tyronne Clark, I call Anthony Ford; and if he's attendant [phonetic], Anthony Ford hands me-hands the money over to me." Clark directed Obilo to contact Ford when Clark was unavailable.
 
 
 7
 Obilo testified that he and Clark continued to engage in "a whole lot of [heroin deals]," and sometime after June 1990, "I dealt with Anthony Ford once himself alone. I dealt with him once, and that was when he was trying to go alone because they were having a little problem. I didn't really get into it.... I gave him [Ford], I think, about 50 grams of heroin at that very meeting."
 
 
 8
 Obilo further testified that on September 29, 1990, Clark, Ford, and Anthony Hodge met in the lobby of the apartment building where Obilo's partner in the heroin trade, Emmanuel "Claytus" Anudu, lived, to purchase 600 grams of heroin for $126,000. Obilo testified that, following the drug transaction, Hodge, Clark, and Ford "all left together in the same car they came with."
 
 
 9
 It is a well-established principle that defendants who are charged in the same criminal conspiracy ordinarily should be tried together. See Zafiro v. United States, 113 S. Ct. 933, 937 (1993); United States v. Brooks, 957 F.2d 1138, 1145 (4th Cir.), cert. denied, 112 S.Ct. 3051 (1992). Severance is appropriate only when a party will be unduly prejudiced by a joint trial, see Fed. R. Crim. P. 14, and the decision to deny severance, which is within the sound discretion of the district judge, "will not be overturned unless the defendant affirmatively demonstrates a clear abuse of discretion through having been deprived a fair trial and having suffered a miscarriage of justice." United States v. Spitler, 800 F.2d 1267, 1271-72 (4th Cir. 1986).
 
 
 10
 In this case, the indictment jointly charged the appellants with a drug conspiracy and with a substantive count of possession of heroin with intent to distribute. Ford could not have been unfairly prejudiced by the evidence of Clark's drug transactions with others because Ford was substantially involved as Clark's "partner" in the drug trade and was therefore jointly responsible for those transactions, even if they occurred in his absence or without his knowledge. See Pinkerton v. United States, 328 U.S. 640 (1946) (holding that a party to a continuing conspiracy may be responsible for substantive offenses committed by a co-conspirator in furtherance of the conspiracy, even though the party does not participate in the substantive offenses or have knowledge of them).
 
 
 11
 The same is true regarding the alleged prejudicial evidence of Clark's possession of weapons. Although Obilo's testimony about Clark's possible role in the murder of "Lucky" might have been somewhat inflammatory, it was also extremely brief and it cannot be said that the testimony, standing alone, caused Ford to suffer a miscarriage of justice. Moreover, because there were but two defendants in this case, it is highly probable that the jury had no problem keeping separate the evidence concerning each person's role in the heroin operation, as the trial judge instructed them they must. See Joint Appendix at 431-32. We thus find that Ford has not demonstrated that the district court abused its discretion in denying the motion to sever or that the joinder caused him to be deprived of a fair trial.
 
 II
 
 12
 Ford also contends that at trial he was prohibited from fully exposing on cross-examination that Obilo had previously failed to identify him as a drug participant in other trials where Obilo testified. We find, however, that Obilo was cross-examined extensively about his failure to mention Ford during previous testimony and therefore we find no error by the district court in controlling duplicative evidence.
 
 III
 
 13
 Clark and Ford contend that the trial court erred in denying their motions for a new trial based on newly discovered evidence. During his testimony at trial, Obilo was cross-examined about his plea agreement with the government, his motive for cooperating with the government, and any drug-derived assets that he may have forfeited to the government. On redirect examination, he stated that he possessed no drug assets at the time of the June 1991 arrest which led to his cooperation in this case. During a series of debriefings of Obilo following the trial, the government became aware that, in 1990, Obilo gave his brother-in-law $100,000 in drug proceeds to be deposited. It was also discovered that Obilo had subsequently agreed to forfeit his interest in the $100,000, and that the government was in the process of seeking forfeiture of the drug money.
 
 
 14
 Clark and Ford contend that the proper standard for determining whether a new trial should have been granted is that set out in United States v. Wallace, 528 F.2d 863 (4th Cir. 1976). In Wallace the court held that, when a witness recants testimony given at trial, a new trial should be granted when (a) the court is reasonably well satisfied that the testimony given by a material witness is false; (b) without the evidence a jury might have reached a different conclusion; and (c) the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial. The government argues that the proper standard is that which is ordinarily used when determining whether a new trial should be granted under Fed. R. Crim. P. 33 based on newly discovered evidence. That standard requires, among other things, that the new evidence would "probably result in acquittal" upon retrial. See United States v. Chavis, 880 F.2d 788, 793 (4th Cir. 1989).
 
 
 15
 We note that the standard announced in Wallace applies only when a witness actually "recants" previous trial testimony. See Wallace, 528 F.2d at 866. Here, Obilo did not recant, although the new evidence suggests that he may have perjured himself by stating under oath at trial that he possessed no drug assets at the time of his 1991 arrest. We also note that the court in Wallace expressly reserved for another case the standard to be applied "when the recanted testimony was only collateral, cumulative, or corroborative." Id. at n.3.
 
 
 16
 In this case, the portion of Obilo's testimony put to question was collateral to his testimony about the criminal acts of the appellants. We nevertheless find that, even if the lesser standard of Wallace were to be applied, we could not conclude that the jury"might" have reached a different result absent Obilo's testimony that he possessed no drug assets. While we fully recognize that the charge that a witness may have committed perjury is a serious one, in this case, Obilo provided voluminous and detailed testimony about the drug dealings of Clark and Ford, and the questioned testimony concerned a totally collateral matter regarding the witness' circumstances, not the appellants'. Moreover, no suggestion is made that the prosecutors had any knowledge about the alleged misstatements at the time of trial.
 
 IV
 
 17
 Challenging his sentence Ford contends that the district court's finding on the quantity of drugs imputed to him, 4.75 kilograms of heroin, is clearly erroneous, arguing that he is being held accountable for drugs that were not reasonably foreseeable to him. We reject the contention.
 
 
 18
 Under the Sentencing Guidelines, a defendant may be sentenced based on the amount of drugs that were the reasonably foreseeable subject of the group criminal activity in which he or she participated. See U.S.S.G. § 1B1.3(a)(1)(B) (defendant's offense level shall, in the case of a jointly undertaken criminal activity, be based on "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity"); see also, Application Note 2 to § 1B1.3 ("The conduct of others that was both in furtherance of, and reasonably foreseeable in connection with, the criminal activity jointly undertaken by the defendant is relevant conduct under this provision"). Ford was present at a meeting where Clark told Obilo that he had $100,000 and wished to spend it on heroin, and was present a week later when Clark suggested to Obilo that he meet his partner, "Lucky." The subsequent meeting of Obilo and Lucky led to two transactions, each involving 500 grams of heroin. Ford was also present at a meeting in January 1990, where it was agreed that Clark would begin dealing with Obilo in the same fashion as had Lucky, and the purchase of 300 grams of heroin was discussed. He was present when Clark later obtained the 300 grams and paid Obilo $56,000. The three men also "talked about ... getting more heroin ... [,] about how much we can make if we continue supplying ourselves with a large quantity of heroin." After Clark paid Obilo the $56,000, Obilo gave him another 400 grams of heroin, on credit. Obilo testified that, after June 1990, he gave Ford about 50 grams of heroin and that, on September 29, 1990, Clark and Ford were present at the apartment building of Emmanuel Anudu. This meeting led to the purchase of 600 grams of heroin for $126,000. This testimony of direct involvement attributes about 2350 grams of heroin to Ford.
 
 
 19
 In addition, other testimony about the foreseeable activities of the conspiracy indicated that Clark sold 1200 grams of heroin through a courier named "Keith," that 800 grams was sold by Obilo to Clark and a person identified as "Winston," and that another 400 grams of heroin was sold by Obilo to Clark and Anthony Hodge. This brings the total to about 4.75 kilograms of heroin sold by Obilo to Clark. Ford was present for many of these sales, and those transactions for which he was not present should have been reasonably foreseeable to him because testimony established that he was a partner of Clark in the entire conspiracy and was often there when the operation's future sales were discussed. We are satisfied that the district court's findings are supported by evidence.
 
 V
 
 20
 Ford also challenges the district court's denial of his motion for a trial continuance, contending that late discovery of some documents which the government intended to introduce at trial, when combined with the fact that his attorney had just completed a long criminal trial prior to this case, resulted in an inability to prepare fully for trial.
 
 
 21
 A court abuses its discretion in refusing to grant a continuance, thereby violating the defendant's Sixth Amendment right to the effective assistance of counsel, only if it exhibits"an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." Morris v. Slappy, 461 U.S. 1, 11-12 (1983) (quotation omitted). We find no such unreasonable behavior by the district court in this case.
 
 
 22
 Moreover, the denial of a motion for continuance must be shown to have prejudiced the defendant's case, and will not constitute reversible error unless the defendant can "point to specific errors made by defense counsel that undermine confidence in the outcome of the trial." United States v. LaRouche, 896 F.2d 815, 823 (4th Cir.), cert. denied, 496 U.S. 927 (1990). Ford has not identified any specific errors that occurred at trial that would not have taken place if his motion for continuance had been granted. We therefore reject this argument.
 
 VI
 
 23
 Clark next contends that the evidence was not sufficient to support his convictions, and that therefore the trial court erred in denying his motion for acquittal. In reviewing the sufficiency of the evidence in a criminal case, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 24
 Clark argues first that the evidence produced at trial did not establish that the substance he and Ford were convicted of buying and selling was in fact heroin. In United States v. Dolan, 544 F.2d 1219 (4th Cir. 1976), we held that lay testimony and circumstantial evidence may be sufficient, without the introduction of expert chemical analysis, to establish the identity of the substance involved in an alleged narcotics transaction, and noted:
 
 
 25
 Such circumstantial proof may include evidence of the physical appearance of the substance involved in the transaction, evidence that the substance produced the expected effects when sampled by someone familiar with the illicit drug, evidence that the substance was used in the same manner as the illicit drug, testimony that a high price was paid in cash for the substance, evidence that transactions involving the sub stance were carried on with secrecy or deviousness, and evidence that the substance was called by the name of the illegal narcotic by the defendant or others in his presence[.]
 
 
 26
 Id. at 1221; see also, United States v. Scott, 725 F.2d 43 (4th Cir. 1984).
 
 
 27
 Applying various of the factors identified in Dolan, we are satisfied that there was sufficient evidence to allow a rational fact-finder to conclude, beyond a reasonable doubt, that the substance being bought and sold by Clark and Ford was heroin. There was extensive testimony at trial that large cash prices were repeatedly paid for the substance at issue, that transactions involving the substance were carried on with high secrecy and deviousness, and that the substance was referred to as "heroin" by the appellants and others in their presence, all experienced drug dealers. The drug ring operated by Anudu and Obilo often and over a long time period sold the substance at issue to the appellants. At no time did the appellants or their customers ever complain that the substance was not heroin, but instead were eager to replenish their supply, again in exchange for large sums of money. The circumstantial evidence is compelling. See United States v. Eakes, 783 F.2d 499, 506 (5th Cir.) ("The fact that various conspirators successfully imported and sold the substance three times indicates that they dealt with cocaine and not a counterfeit product"), cert. denied, 477 U.S. 906 (1986).
 
 
 28
 Clark also challenges the sufficiency of the evidence supporting his gun convictions. Clark was convicted under 18 U.S.C.s 924(c)(1) on the basis of Agent Plummer's testimony that, upon arriving at Clark's apartment with Anudu on October 11, 1990, Plummer saw Clark brandishing a .357 Magnum handgun. When Clark discovered that the guests were his fellow drug dealers, he put down the firearm, and the three men discussed drugs and money.
 
 
 29
 To support a conviction under § 924(c)(1), it must be shown beyond a reasonable doubt that a defendant used or carried a firearm during, and in relation to, a crime of violence or drug trafficking crime. Clark contends that the evidence was not sufficient to establish that what Agent Plummer saw in Clark's hands was a firearm. In United States v. Jones, 907 F.2d 456 (4th Cir. 1990), cert. denied, 498 U.S. 1029 (1991), the defendants challenged the sufficiency of the evidence supporting their § 924(c)(1) convictions, contending that the only evidence that a firearm was used during a bank robbery came from testimony of witnesses unfamiliar with firearms and from bank photographs. The Jones defendants argued that a § 924(c)(1) conviction must, at a minimum, be supported by expert testimony identifying the weapon at issue as a firearm. We found that argument to be without merit, and held instead that "[a]s five eyewitnesses testified that a gun was used in the robbery, there was evidence from which rational triers of fact could find guilt beyond a reasonable doubt on the firearms charge." Id. at 460.
 
 
 30
 We find likewise that the evidence in this case was sufficient to support Clark's § 924(c)(1) conviction for use of a firearm in relation to a drug trafficking crime. A drug conspiracy charge under 21 U.S.C. § 846 is a proper predicate for a § 924(c)(1) offense. See United States v. Meggett, 875 F.2d 24 (2d Cir.), cert. denied, 493 U.S. 858 (1989); United States v. Diaz, 864 F.2d 544 (7th Cir. 1988), cert. denied, 490 U.S. 1070 (1989). Although only one witness, Agent Plummer, identified what Clark was brandishing as a .357 handgun, that witness was a law enforcement officer experienced in firearms. Such testimony is sufficient to establish, beyond a reasonable doubt, Clark's October 11, 1990 possession of a firearm. There was also sufficient evidence to show that the gun was used to facilitate the success of the appellants' drug operation, because the weapon was displayed in the context of a meeting where drugs and drug money were discussed. See United States v. Paz, 927 F.2d 176, 179 (4th Cir. 1991) (" '[I]t is enough [to support a conviction under § 924(c) ] if the firearm is present for protection and to facilitate the likelihood of success [of the underlying crime], whether or not it is actually used' ") (citation omitted).
 
 
 31
 Clark was also convicted under § 924(c)(1) and 18 U.S.C. § 922(g)(1) for possession of a handgun which was seized from his apartment on July 1, 1991. Special Agent Mortimer testified about the execution of a search warrant on that date at 4607 Horizon Circle, Apartment 204 in Pikesville, Maryland. The apartment was leased to Clark, but he was not present during the search. Recovered from the apartment was a Glock .40 caliber handgun, large quantities of ammunition and currency, personal identification of Clark, and a notebook containing references to persons and various numbers of "bundles."
 
 
 32
 We have held that "constructive possession of firearms in relation to a drug transaction is sufficient to establish'use' " for purposes of sentencing under 18 U.S.C. § 924(c)(1). Paz, 927 F.2d at 179. To establish constructive possession, " 'the government must produce evidence showing ownership, dominion, or control over the contraband itself or the premises or vehicle in which the contraband is concealed.' " United States v. Blue, 957 F.2d 106 (4th Cir. 1992) (citation omitted). Clark's landlord testified that Clark leased the apartment where the gun was discovered on November 28, 1990, and "moved in on December 15, 1990." His lease did not expire until January 14, 1992, well after the date of the search. We find this evidence to be sufficient.
 
 
 33
 The evidence was also sufficient to establish that the handgun was possessed "during and in relation to" the drug conspiracy. There is little doubt that the firearm was possessed by Clark"during" the conspiracy alleged in the indictment. At the time the Glock firearm was seized, large amounts of drug money were also confiscated from Clark's apartment, as was personal identification of Clark and ledgers containing records from drug transactions. Extensive testimony established that, at the time of the seizure, Clark had been engaged in the business of distributing heroin for at least 18 months. This evidence, "coupled with the common sense recognition that drug dealing is a dangerous and often violent enterprise," amply supports the inference that the gun seized from Clark's apartment was used by him to facilitate his drug operation. United States v. Brockington, 849 F.2d 872, 876 (4th Cir. 1988).
 
 VII
 
 34
 Clark next contends that the jury should have been instructed to draw a negative inference about the contents of two tapes not introduced by the government into evidence at trial. The government introduced several tape recordings of conversations which took place between Agent Plummer and others, including Clark, implicating the appellants in criminal drug activity. During his cross-examination of Agent Plummer, Clark's attorney established that there were tapes of two meetings between Agent Plummer and Clark which were not entered into evidence or played for the jury. At closing argument, Clark's attorney commented on the government's failure to play the tapes, and suggested that this failure indicated that the alleged transactions did not actually occur. When instructing the jury, the district judge stated that "you cannot speculate what might be on a tape which you do not hear. For example, if the argument is made that simply because you didn't hear anything, that you didn't hear a tape, there must be something on there, you cannot speculate on that." Clark took exception to the instruction.
 
 
 35
 He now contends that it was an improper exercise of the court's discretion to instruct the jury in that manner and that the jury should have been allowed to draw a negative inference from the government's failure to introduce tapes which were specifically in its exclusive control and domain. He argues that the situation is analogous to that of a "missing witness." See United States v. Brooks, 928 F.2d 1403, 1412 (4th Cir.) ("It is well settled that'the rule regarding missing witness instructions is that if a party has it peculiarly within his or her power to produce witnesses whose testimony would elucidate the transaction, the fact that he or she does not do it creates the presumption that the testimony, if produced, would be unfavorable' ") (citation omitted), cert. denied, 112 S.Ct. 140 (1991).
 
 
 36
 Even if the government's failure to produce the tapes in this case were sufficiently analogous to invoke the rule regarding the drawing of a proper negative inference when a party fails to produce at trial a witness that is exclusively within his or her control, we would find that defense counsel did not establish the proper predicate for drawing such a negative inference here. A party must make some showing at trial that it is reasonably probable that the missing evidence would have proven helpful before it is proper for a trial judge to instruct a jury that it may draw a negative inference from the party's failure to admit the evidence. See United States v. Rollins, 862 F.2d 1282, 1298 (7th Cir. 1988) (to invoke the missing witness rule, the moving party must "demonstrate that the missing witness would elucidate issues in the case," because "[i]t is impermissible to allow a jury to infer that a missing witness' testimony would have been unfavorable ... 'where the unpresented evidence would be merely cumulative' ") (citation omitted), cert. denied, 490 U.S. 1074 (1989); United States v. Nichols, 912 F.2d 598, 602-03 (2nd Cir. 1990). No such showing was made in this case, and we therefore need not reach the question whether the doctrine is applicable to tapes.
 
 VIII
 
 37
 Finally, Clark contends that the trial court erred in sentencing him as a career criminal offender because the two predicate state offenses were "consolidated" and therefore did not constitute two prior felonies. Under U.S.S.G. § 4B1.1, a defendant may be sentenced as a career offender if (1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense. Under § 4B1.2(3), the term "two prior felony convictions" requires that the sentences issued for the felony convictions be counted separately under the Guidelines. Guideline § 4A1.2(a)(2) provides that prior sentences imposed in related cases are to be treated as one sentence for purposes of sentencing under the Guideline's career criminal provisions, and Application Note 3 to § 4A1.2 provides that prior sentences are considered related if they were consolidated for trial or sentencing.
 
 
 38
 Clark was previously convicted of assault with intent to commit murder in the Criminal Court of Baltimore on September 3, 1985. Six months later, on March 13, 1986, he was convicted in the same court of attempted murder. Although he was tried and sentenced on separate dates, Clark argues that a plea agreement under which the state sentencing judge imposed concurrent five year sentences for the two separate convictions effected a "consolidation" and that it was error to count them separately in finding him to be a career criminal offender. We have noted, however, that "[s]imply because two convictions have concurrent sentences does not mean that the crimes are 'related' [for sentencing purposes].... Mere concurrent sentences are not enough to defeat the policy of the Guidelines." United States v. Rivers, 929 F.2d 136, 140 (4th Cir.) (citation omitted), cert. denied, 112 S. Ct. 431 (1991). Because Clark has offered no evidence that his two prior felony convictions were in fact related or consolidated for trial or sentencing, the fact that the sentences on both were imposed to run concurrently does not render the two convictions as one for Sentencing Guideline purposes.
 
 
 39
 For the reasons given, we affirm the judgments of the district court.
 
 AFFIRMED