COURT OF APPEALS OF VIRGINIA

**PUBLISHED**

Present:    Judges Fulton, Ortiz and Senior Judge Petty
Argued by videoconference


PRISCILLA ANN HOLMES

v.      Record No. 0250-22-3

COMMONWEALTH OF VIRGINIA                          OPINION BY
                                        JUDGE JUNIUS P. FULTON, III
PRISCILLA ANN HOLMES                           NOVEMBER 22, 2022

v.      Record No. 0251-22-3

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
W. Chapman Goodwin, Judge

H. Eugene Oliver, III (Evans Oliver, PLC, on brief), for appellant.

Ken J. Baldassari, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the Circuit Court of Augusta County convicted Priscilla Holmes of

two counts of racketeering in violation of Code § 18.2-514(C). Holmes appeals her convictions,

challenging the sufficiency of the Commonwealth's evidence against her and the trial court's

denial of three proposed jury instructions. For the following reasons, we affirm in part, reverse

in part, and remand this case to the circuit court for a new trial.

## I. BACKGROUND

The Commonwealth charged Holmes by indictment alleging two counts of

> knowingly, intentionally, willfully, unlawfully and feloniously,
> while associated with any enterprise, as defined in Virginia Code
> Section 18.2-513, did commit namely two or more of the following
> offenses: possession of a Schedule I or II controlled substance,
> and/or distribution or possession with intent to distribute a

Schedule I or II substance, and/or distribution or possession with intent to distribute 28 grams or more of methamphetamine.[1]

At trial, the Commonwealth presented evidence of racketeering activity during two time frames.

## A. Evidence of Racketeering

Benjamin Hartless testified for the Commonwealth that after meeting Holmes in December 2017 until his arrest in July 2018,[2] he distributed methamphetamine, purchased from Holmes, in Augusta County. At the time of the trial, Hartless had been using methamphetamine for approximately twenty years. Hartless was introduced to Holmes by a friend. He began selling for her "pretty much right off the bat," starting off selling "eight-balls" or an eighth of an ounce. Hartless would typically break down the eight-ball, "sell a couple of grams out of it to make the money back and then either keep the rest or sell a little bit more out of it." During that time, Hartless was using "anywhere from a half a gram to a gram a day" of methamphetamine. After about a month of selling eight-balls for Holmes, Hartless began to get "a couple of ounces" of methamphetamine at a time from Holmes, which he would break down into eight-balls and sell to people who were further dealing to others.

Eventually, Hartless received one, two, and three pounds of methamphetamine at a time from Holmes. He paid Holmes $15,000 per pound with cash bundled together and wrapped in rubber bands. He would pay the cash to Holmes directly or to Andrea Verdi, a woman who would deliver methamphetamine for Holmes. While Hartless was selling for Holmes, he testified that he generally saw her on a weekly basis when she would drive to Augusta County to

---

[1] In addition to the two violations of Code § 18.2-514(C), for which Holmes was convicted, she was acquitted of two violations of Code § 18.2-514(A).

[2] Notwithstanding Hartless's testimony to these start and end dates, Hartless also testified that he sold for Holmes for around a year.

- 2 -

meet him.  Holmes would typically drive nice-looking SUVs with Georgia plates, which Hartless believed to be rental cars.

When Hartless received methamphetamine by the pound, it would arrive in "like a [Z]iplock bag, wrapped up real tight with plastic wrap around it and then it'd have . . . axle grease around it and then wrapped up again in plastic wrap and then duct taped all tight."  Once he received the large quantity of methamphetamine, Hartless would "unwrap it all and break it down into ounces and then distribute to people" who would then break it down further and sell it. Hartless testified that he sold methamphetamine to at least five other people whom he knew to be dealing to others.  Over the period he sold for Holmes, Hartless estimated he sold fifty or more pounds of methamphetamine.  Hartless testified that until his arrest he maintained a "good name in drug circles" and had a trustworthy reputation on the street.

Roger Holmes (hereinafter "Roger," no relation to the appellant) also testified that he purchased methamphetamine from Holmes for resale in Augusta County.  At the time of trial, Roger had been a methamphetamine user for approximately twenty years.  Roger explained that he met Holmes about thirty years ago, lost contact for fifteen to twenty years, and was reintroduced by a friend in 2018.  Shortly thereafter, Holmes sent two pounds of methamphetamine to Roger, through another person, in a block that was packaged "in a vacuum-sealed bag with coffee in it," which Roger broke up into smaller packages and resold. Sometime thereafter, Holmes traveled to Roger's residence to collect the $28,000 he owed her for the two pounds of methamphetamine he had sold.  Roger only had $24,000, which he paid her in cash.

After that initial money pickup, Roger and Holmes communicated via phone: "She called and asked . . . what I needed, and I told her how much money I'd had, she said somebody would be by.  Then another stranger stopped in and picked up the money and left what I was getting."

Roger sold methamphetamine for Holmes approximately twenty times to five different people, for a total of five pounds.  He confirmed that Verdi delivered a pound of methamphetamine to him for Holmes once and that Holmes never personally brought him any drugs.

Roger began dealing for Holmes after Hartless's arrest in July 2018 and ceased on December 21, 2018, when the Skyline Drug Task Force arrested Holmes at Roger's residence.  Roger, along with Task Force Officer Rosemeier, testified that Roger "set [Holmes] up," telling officers that Holmes was going to Roger's home to bring him two pounds of methamphetamine and collect $14,000 that he owed her.  Although Holmes arrived at Roger's house at the date and approximate time she was expected, driving an SUV with Georgia license plates, she did not have any drugs on her person or in her vehicle and did not attempt to collect any money from Roger before she was arrested.

Verdi testified for the Commonwealth that, at the instruction of Holmes, she delivered large quantities of methamphetamine to Hartless, Roger, and another individual in Virginia, making a total of seven-to-eight trips.  Each of Verdi's visits to Virginia was for the purpose of "either picking up [money], dropping off [methamphetamine], or both."  At Holmes's suggestion, Verdi delivered the drugs using SUVs and would store them either in the trunk or "above the tire underneath the cupholders."  The methamphetamine was packaged "in like freezer bags . . . like vacuum sealed."  Holmes provided the addresses, paid for the rental cars, and paid Verdi between $800 and $1,200 per trip.  On two separate occasions, Holmes also sent Verdi to pick up methamphetamine from an individual in Atlanta.

Officer Hilliard of the Skyline Drug Task Force testified, without objection, that "numerous people" identified Holmes as a drug dealer in Augusta County.  In addition to the testimony of Holmes's three accomplices and the task force officers involved in the investigation and arrest, the Commonwealth introduced into evidence two certificates of analysis.  The first

certificate of analysis showed that on July 31, 2018, police recovered just over half a pound of methamphetamine from Hartless.  The second showed that in December 2018, nearly one pound of methamphetamine was recovered just after Verdi delivered it to Roger on his property.

At the conclusion of the Commonwealth's evidence, Holmes made a motion to strike, which was denied.  Holmes declined to present any evidence and made renewed motions to strike, which the court also overruled.

B.  Jury Instructions

Three of Holmes's proposed jury instructions were rejected by the trial court.  Proposed Instruction I stated (rejected paragraphs italicized):

> You are the judge of the facts, the credibility of the witnesses, and the weight of the evidence.  You may consider the appearance and manner of the witnesses on the stand, their intelligence, their opportunity of knowing the truth and for having observed the things about which they testified, their interest in the outcome of the case, their bias, and, if any have been shown, their prior inconsistent statements, or whether they have knowingly testified untruthfully as to any material fact in the case.
>
> You may not arbitrarily disregard believable testimony of a witness.  However, after you have considered all the evidence in the case, then you may accept or discard all or part of the testimony of a witness as you think proper.
>
> *Although one or more witnesses may positively testify as to an alleged fact and although that testimony may not be contradicted by other witnesses, you may altogether disregard that testimony if you believe it to be untrue.*
>
> You are entitled to use your common sense in judging any testimony.  From these things and all the other circumstances of the case, you may determine which witnesses are more believable and weigh their testimony accordingly.
>
> *If you believe from the evidence that any witness has knowingly testified falsely as to any material fact in this case, you have a right to discredit all of the testimony of that witness or to give to such testimony such weight and credit as in your opinion it is entitled.*

The court instructed the jury on the first, second, and fourth paragraphs of Instruction I, but rejected the third and fifth paragraphs, holding that the issues raised there were "adequately covered" by the model jury instruction and that "anything more[] was duplication and/or could be confusing to the jury."

Proposed Instruction Q stated:

> Where a fact is equally susceptible to two interpretations, one of which is consistent with the defendant's innocence, you may not arbitrarily adopt the interpretation which finds him guilty.

Declining to give Instruction Q, the court stated that it "has given an instruction as to the jury's obligation and rights and how they should interpret evidence that comes in. It is their factual determination as to whether to believe and what weight and credibility should be applied to each piece of evidence and to each piece of testimony." The court further concluded that Instruction Q was "argumentative with regard to the obligation that [the jury] ha[s] and it intrudes upon their fact finding issues."

Proposed Instruction T stated:

> You have heard testimony from accomplices in the commission of the crime charged in the indictment. While you may find your verdict upon their uncorroborated testimony, you should consider such testimony with great care and you are cautioned as to the danger of convicting the defendant upon the uncorroborated testimony of an accomplice or accomplices. Nevertheless, if you are satisfied from the evidence of the guilt of the defendant beyond a reasonable doubt, the defendant may be convicted upon the uncorroborated evidence of an accomplice or accomplices.

In rejecting Instruction T, the court noted that "the testimony of the witness itself can contain the corroboration and in this case there was ample corroboration of the cases."[3]

---

[3] The court continued in its analysis:

> The question as to the admissibility of the statement is where this matter is determined. The Court is obligated as a matter of law to

- 6 -

At the end of the trial the jury found Holmes guilty of "Racketeering with regard to criminal activity occurring in Augusta County between July 31, 2017 and July 31, 2018," and "Racketeering with regard to criminal activity occurring in Augusta County between August 1, 2018 and December 21, 2018."

## II. ANALYSIS

Holmes assigns error to her convictions, asserting that the trial court erred in convicting her "because the Commonwealth failed to prove two distinct acts" of criminal activity in support of each of the racketeering indictments and because the evidence was insufficient as a matter of law to sustain the racketeering convictions. She likewise assigns error to the trial court's rejection of Instructions I, Q, and T.

### A. Sufficiency of the Evidence

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does

---

determine whether there is sufficient evidence to support that or to corroborate that before it allows the statement in. There was no objection to the statement at the time that it was put in and the Court made the determination that there was corroboration of that. So the Court has made the determination as a matter of law that the testimony was admissible and the matter of law determination is for the Court to make and not for the jury to make. And to give this instruction allows the jury to get a second bite at something that the Judge has already determined as a matter of law.

The jury instruction arguments in this case were made in chambers, off the record, and Holmes's objections to the court's rulings, along with the court's explanations, were put on the record after the jury retired to consider the case. Consequently, the court's explanation for its ruling on the record is somewhat incomplete. We note that the court, in making its ruling on the record, seems to conflate the issues of admissibility and whether there was sufficient corroboration to obviate the need for the cautionary jury instruction. Nevertheless, the trial court's reason for its denial is immaterial as we review its ruling *de novo*.

- 7 -

not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)). To the extent determining whether the evidence was sufficient to support a conviction involves interpreting the statute itself, that is a question of law which we review *de novo*. *See Woodard v. Commonwealth*, 287 Va. 276, 280 (2014).

Holmes was convicted of two counts of racketeering, in violation of Code § 18.2-514(C), which provides that "[i]t shall be unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through racketeering activity." "'Racketeering activity' means to commit, attempt to commit, or conspire to commit or to solicit, coerce, or intimidate another person to commit two or more" enumerated offenses. Code § 18.2-513. In this case, the Commonwealth amended the indictments from the broad list of enumerated offenses contained in Code § 18.2-513, narrowing them to allege more specific drug crimes. The Commonwealth was therefore required to prove that Holmes specifically committed "two or more" violations of "possession of a Schedule I or II controlled substance, and/or distribution or possession with intent to distribute a Schedule I or II controlled substance, and/or distribution or possession with intent to distribute 28 grams or more of methamphetamine."

Holmes argues the evidence was insufficient to prove beyond a reasonable doubt that she "committed two distinct acts as alleged in the indictments, for each indictment." Specifically, she argues that only one certificate of analysis proving the presence of methamphetamine was established for each indictment, and the other circumstantial evidence of a second distinct act did not sufficiently establish the nature of the substances delivered to and subsequently redistributed by Hartless and Roger.

It is not necessary for the Commonwealth to prove the nature of an illegal substance using direct evidence, such as a certificate of analysis. *Hill v. Commonwealth*, 8 Va. App. 60, 63 (1989) (citing *United States v. Zielie*, 734 F.2d 1147, 1156 (11th Cir. 1984); *United States v. Gregorio*, 497 F.2d 1253, 1263 (4th Cir. 1974)). Rather, the nature of the substance can be proven by circumstantial evidence. *Id.* The types of circumstantial evidence that may be considered in assessing whether the illicit nature of a substance is proven beyond a reasonable doubt includes, but is not limited to:

> the physical appearance of the substance involved in the transaction, evidence that the substance produced the expected effects when sampled by someone familiar with the illicit drug, evidence that the substance was used in the same manner as the illicit drug, testimony that a high price was paid in cash for the substance, evidence that transactions involving the substance were carried on with secrecy or deviousness, and evidence that the substance was called by the name of the illegal narcotic by the defendant or others in his presence.

*Id.* (quoting *United States v. Dolan*, 544 F.2d 1219, 1221 (4th Cir. 1976)).

Holmes notes that none of the methamphetamine use Hartless and Roger testified about was "tied to the specific methamphetamine [Holmes] is alleged to have distributed" and neither Hartless nor Roger was qualified as an expert witness. However, circumstantial evidence of the nature of an illegal substance need not include expert testimony. "Users and addicts, if they have gained familiarity or experience with a drug, may identify it. Numerous courts have permitted

lay purchasers of drugs to testify as to the identification of drugs after previous use has been demonstrated." *Hill*, 8 Va. App. at 63. In this case, the evidence clearly established that Hartless and Roger were longtime methamphetamine users and, therefore, were familiar enough with the drug to identify it. Further, although Hartless did not testify directly about any particular occasion when he ingested the methamphetamine he received from Holmes, he testified that during the period he was selling for Holmes he was using "anywhere from a half a gram to a gram a day" and would sometimes keep a portion of the methamphetamine he received from Holmes. Moreover, we note that although the testimony in *Hill* was that the witness *had* used the cocaine at issue, the standard described by this Court in *Hill* does not require testimony that the user/addict used the specific batch of drugs about which they are testifying. *See id.* (allowing users to testify about the identity of drugs "after previous use has been demonstrated").

Hartless and Roger both testified they paid Holmes $14,000 to $15,000 per pound of methamphetamine. The price was paid in cash, which was packaged in rubber bands. The substance delivered to them was also packaged like large quantities of methamphetamine. Hartless, Roger, and Verdi all testified that it was packaged in vacuum-sealed bags and delivered to Hartless and Roger surreptitiously. Hartless and Roger both explained that the bags were packaged with another substance to conceal the scent of the methamphetamine and deter narcotics dogs, such as coffee or axle grease. Verdi testified that she would deliver the methamphetamine using rented SUVs and, at Holmes's instruction, concealed the drugs "above the tire underneath the cupholders." Thus, "a high price was paid in cash for the [methamphetamine]" and "transactions involving the [methamphetamine] were carried on with secrecy or deviousness." *Id.* (quoting *Dolan*, 544 F.2d at 1221).

In addition to Hartless's implication that he personally used the methamphetamine he purchased from Holmes, he testified that he sold about fifty or more pounds of

methamphetamine that he received from Holmes for around a year to at least five different people whom he knew to be dealing to others and that prior to his arrest he had a "good name in drug circles" and a trustworthy reputation on the street. Roger testified that he sold a total of five pounds of methamphetamine for Holmes to five different people spread out over approximately twenty different sales. A reasonable factfinder could conclude from this evidence of the large and steady amount of Holmes-supplied methamphetamine in Augusta County that the substance Hartless and Roger sold for Holmes "had the physical appearance of [methamphetamine]," "was used in the same manner as [methamphetamine]," and "produced the expected effects when sampled by someone familiar with [methamphetamine]." *Hill*, 8 Va. App. at 63 (quoting *Dolan*, 544 F.2d at 1221).

Finally, the court received testimony from Hartless, Roger, and Verdi that each of them communicated with Holmes regarding the purchase, delivery, and sale of methamphetamine. Hartless testified that a friend introduced him to Holmes and initially told him that Holmes wanted to purchase methamphetamine from him, but when the two met in person Hartless learned that Holmes was actually trying to sell to him. This included discussions about the quantity and price of the methamphetamine, how it would be packaged, and how it would be delivered. A reasonable factfinder could conclude from the accomplices' testimony about their communications with Holmes that "the substance was called by the name of the illegal narcotic by the defendant or others in his presence." *Id.* (quoting *Dolan*, 544 F.2d at 1221).

Taking the totality of the *Hill* factors into consideration, there was sufficient circumstantial evidence for a factfinder to conclude that the substance Holmes dealt to Hartless and Roger was methamphetamine.

- 11 -

Holmes also challenges the sufficiency of the evidence "tying [her] to the charges at hand." She argues that the evidence at trial failed to exclude all reasonable hypotheses of innocence because

> she was never caught with drugs or money, she was supposed to have been delivering narcotics where there were no narcotics and no cash, she had known Roger Holmes and Andrea Verdi outside the context of the alleged distribution ring, and brought grandchildren to a supposed large scale methamphetamine deal among many others.

We disagree and hold that when viewed in the light most favorable to the Commonwealth, the record contained sufficient evidence to convict Holmes of racketeering.

Three accomplices, Hartless, Roger, and Verdi, all testified that Holmes facilitated and directed the distribution of methamphetamine in Augusta County. As our Supreme Court has held, a "jury if satisfied of guilt, may convict an accused upon the uncorroborated testimony of an accomplice." *Dillard v. Commonwealth*, 216 Va. 820, 821 (1976). The accomplices testified unequivocally that they communicated with Holmes about purchasing and distributing large quantities of methamphetamine, which she then either delivered or directed to be delivered to Augusta County, and for which she collected large payments. This testimony, taken in the light most favorable to the Commonwealth, foreclosed all reasonable hypotheses of innocence and provided the factfinder with more than sufficient evidence to conclude, beyond a reasonable doubt, that Holmes was guilty of racketeering.

### B. Jury Instructions

The responsibility of properly instructing a jury "rest[s] in the sound discretion of the trial court." *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009). "A reviewing court's responsibility in reviewing jury instructions," however, "is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)).

"We review a trial court's decisions in giving and denying requested jury instructions for abuse of discretion." *Conley v. Commonwealth*, 74 Va. App. 658, 675 (2022). Whether a proffered jury instruction accurately states the law, however, is reviewed *de novo*. *Sarafin v. Commonwealth*, 288 Va. 320, 325 (2014). "And in deciding whether a particular instruction is appropriate, we view the facts in the light most favorable to the proponent of the instruction." *Cooper*, 277 Va. at 381.

### 1. Jury Instruction I

Holmes argues that the trial court erred in refusing two specific paragraphs from Jury Instruction I. The first rejected paragraph, which states: "Although one or more witnesses may positively testify as to an alleged fact and although that testimony may not be contradicted by other witnesses, you may altogether disregard that testimony if you believe it to be untrue," arises from an instruction given in *Blount v. Commonwealth*, 213 Va. 807, 808 (1973). The second rejected paragraph states: "If you believe from the evidence that any witness has knowingly testified falsely as to any material fact in this case, you have a right to discredit all of the testimony of that witness or to give to such testimony such weight and credit as in your opinion it is entitled," and originates in *Zirkle v. Commonwealth*, 189 Va. 862 (1949), and Ronald J. Bacigal & Margaret Ivey Bacigal, *Virginia Practice Series: Jury Instructions* §§ 57:4 and 57:7 (2014-2015 ed.).

Both rejected paragraphs in Jury Instruction I are accurate statements of the law, but our analysis does not stop there. Rather, we must look to whether the "*granted* instructions fully and fairly cover a principle of law." *Daniels v. Commonwealth*, 275 Va. 460, 466 (2008) (emphasis added). When they do, "a trial court does not abuse its discretion in refusing another instruction relating to the same legal principle." *Id.* (quoting *Stockton v. Commonwealth*, 227 Va. 124, 145 (1984)). In this case, the principles of law discussed in the rejected paragraphs were already

- 13 -

covered by other instructions that were given to the jury. In Instruction Number 5, the court instructed that the jurors "are the judges of the facts, the credibility of the witnesses, and the weight of the evidence," that they "may not arbitrarily disregard believable testimony of a witness," but after they "have considered all the evidence in the case, then [the jurors] may accept or discard all or part of the testimony of a witness as [the jurors] think proper." Further, the jury was instructed that it may consider a witness's "bias, and, if any have been shown, their prior inconsistent statements, or whether they have knowingly testified untruthfully as to any material fact in the case." Because Instruction Number 5 fairly and adequately instructed the jury on the principles of law discussed in the rejected paragraphs of Jury Instruction I, a duplicative instruction would inappropriately "single out for emphasis a part of the evidence tending to establish a particular fact," *Woods v. Commonwealth*, 171 Va. 543, 548 (1938), and "would be confusing or misleading to the jury," *Bruce v. Commonwealth*, 9 Va. App. 298, 300 (1990).

### 2. *Jury Instruction Q*

Our conclusion that Jury Instruction Q was properly rejected results from the same analysis that defeated Holmes's claims regarding Jury Instruction I. An instruction that "Where a fact is equally susceptible to two interpretations, one of which is consistent with the defendant's innocence, you may not arbitrarily adopt the interpretation which finds him guilty" is simply duplicative of other granted instructions. The court already instructed the jury on the presumption of innocence (Instruction Number 1), including that "the Commonwealth [must] prove[] each and every element of the crime beyond a reasonable doubt." The court likewise instructed, through Instruction Number 6, that "When the Commonwealth relies upon circumstantial evidence, the circumstances proved must be consistent with guilt and inconsistent with innocence. It is not sufficient that the circumstances proved create a suspicion of guilt,

- 14 -

however strong, or even a probability of guilt" and that "The evidence as a whole must exclude every reasonable theory of innocence." The "court's use of the[se] model jury instruction[s] left no vital issue unaddressed." *Shaikh v. Johnson*, 276 Va. 537, 546 (2008).

Instruction Number 1 and Instruction Number 6 fairly and adequately instructed the jury on the principles of law discussed in rejected Jury Instruction Q. To nevertheless grant Jury Instruction Q would be duplicative, inappropriately single out a particular fact or issue, and may cause confusion to the jury. Therefore, the trial court did not err in rejecting Jury Instruction Q.

### 3. Jury Instruction T

The final rejected instruction cautioned the jury against the danger of convicting Holmes upon the uncorroborated testimony of an accomplice. Virginia appellate courts have consistently held that:

> if satisfied of guilt, [a jury] may convict an accused upon the uncorroborated testimony of an accomplice. Where accomplice testimony is uncorroborated, however, it is the duty of the court to warn the jury against the danger of convicting upon such uncorroborated testimony. This warning is required because the source of accomplice testimony is tainted with the temptation to exculpate oneself by laying the crime upon another.

*Dillard*, 216 Va. at 821 (citations omitted). *Dillard* makes it clear that if an accomplice's testimony is uncorroborated, it is error for a trial court to refuse the cautionary instruction. *Id.*

In rejecting Jury Instruction T, the court held that the instruction was not warranted because the accomplice testimony was not uncorroborated. The court stated that "the testimony of the witness itself can contain the corroboration and in this case there was ample corroboration of the cases." We disagree. "[T]he danger of collusion between accomplices and the temptation to exculpate themselves by fixing responsibility upon others is so strong that it is the duty of the court to warn the jury against the danger of convicting upon their uncorroborated testimony." *Jones v. Commonwealth*, 111 Va. 862, 868 (1911). Moreover, "[I]f two or more accomplices are

- 15 -

produced as witnesses, they are not deemed to corroborate each other . . . and the same confirmation is required[] as if there were but one." *Id.* (quoting 1 *Greenleaf on Evidence* § 381 (15th ed.)); *see also Via v. Commonwealth*, 288 Va. 114, 115 (2014) ("Whether accomplice testimony is corroborated is subject to the long established principle that accomplice testimony cannot be corroborated by the testimony of another accomplice."). In this case, although the testimony of Holmes's accomplices, Benjamin Hartless, Roger Holmes, and Andrea Verdi, corroborate each other, the "danger of collusion between [these three] accomplices and the temptation to exculpate themselves by fixing responsibility upon others" is not alleviated where the sole corroboration is the testimony of another accomplice to the crime. *Jones*, 111 Va. at 868.

Whether the accomplice testimony was sufficiently corroborated is a question of law for the court. *Dillard*, 216 Va. at 824. It is, therefore, reviewed *de novo* on appeal. The correct standard for "determining whether a cautionary instruction should be granted becomes this: is corroborative evidence lacking? If it is, the instruction should be granted." *Id.* at 822. The proper standard for determining whether sufficient corroboration exists to refuse the cautionary instruction is: "[T]he corroboration or confirmation must relate to some fact (or facts) which goes to establish *the guilt* of the accused." *Id.* at 823 (alteration in original) (quoting *Jones*, 111 Va. at 869). This standard is "not as rigid as the 'ultimate fact' test. The corroborative evidence, standing alone, need not be sufficient either to support a conviction or to establish all essential elements of an offense." *Id.*

An example of the "relation to guilt" standard was outlined in *Crosby v. Commonwealth*, 132 Va. 518 (1922). In that case, Crosby was charged with illegally selling alcohol, which he denied. *Id.* at 520. "An accomplice, the purchaser of the liquor, testified for the Commonwealth that [Crosby] had made the sale." *Dillard*, 216 Va. at 823. The Commonwealth's only

remaining evidence came from "a police officer, who testified he saw the accused at the window of the house where the sale was alleged to have occurred; observed the accused look up and down the street; noticed the alleged purchaser enter the house; and afterwards found whisky in the possession of the purchaser." *Id.* The officer's testimony provided corroboration for "the occasion and opportunity for the crime as well as the possession (by the purchaser) of the whisky alleged to have been purchased." *Id.* (quoting *Crosby*, 132 Va. at 520). As such, Crosby was not "convicted upon the uncorroborated testimony of his accomplice." *Id.*; *see also Johnson v. Commonwealth*, 42 Va. App. 46, 57 (2003) (finding sufficient corroborating evidence where Johnson was seen with her accomplice "immediately prior to the two drug transactions"); *Richards v. Commonwealth*, 187 Va. 1, 4 (1948) (finding sufficient corroboration where "[t]he occasion and the opportunity for the crime, as well as the possession of the beer, were established by testimony other than that emanating from the alleged accomplice"). *Contra Yates v. Commonwealth*, 4 Va. App. 140, 143 (1987) (finding insufficient corroboration to an accomplice's testimony where "[e]xcept for the testimony of [the accomplice], there was neither physical evidence nor testimony that tended to connect Yates with the crime").

The Commonwealth relies upon three different items of evidence which it argues corroborate the accomplice testimony in this case. First, that Roger told the Skyline Drug Task Force that Holmes would go to his house on December 21, 2018, to conduct a methamphetamine transaction, and although Holmes did not have methamphetamine on her person or in her vehicle and no transaction was attempted, she did arrive at the location at the approximate time she was expected. Second, both Hartless and Verdi testified that Holmes used SUVs for the drug transactions, and she in fact arrived at Roger's home on December 21, 2018, in an SUV. Third, Officer Hilliard testified that "numerous people" identified Holmes as a drug dealer in Augusta County. None of this evidence tends to connect Holmes with the racketeering crimes for which

she was convicted. Unlike in *Crosby*, where the police officer's observations established Crosby's proximity to the location of the illegal liquor sale, as well as the reasonable inference that the purchaser received the liquor from him, there was no non-accomplice testimony in this case that Holmes was ever seen with methamphetamine, in Augusta County or otherwise. Roger's "tip" that Holmes would arrive at his home at a specific time to conduct a drug deal failed to bear fruit when she arrived without any drugs and without attempting to collect any money. The bare fact that Holmes drove an SUV does not relate to her guilt to the extent that it can serve as the corroboration for the accomplice testimony.

Finally, the testimony that "numerous people" had identified Holmes as a drug dealer, while "admitted without objection" and thus can be "properly" "considered" and "given its natural probative effect," remains hearsay and is entitled to minimal weight. *Baughan v. Commonwealth*, 206 Va. 28, 31 (1965). "[T]he basis for the exclusion of hearsay testimony is that it is not subject to the tests which can ordinarily be applied for the ascertainment of the truth of such testimony. It has been said that it lacks 'any guarantee of trustworthiness.'" *Stevens v. Mirakian*, 177 Va. 123, 131 (1941). The identity of the declarants, the context of the statements, and the bases of the declarants' knowledge, are entirely unknown. It therefore cannot be known whether the declarants are likewise accomplices in this racketeering enterprise and thus subject to the same requirement of corroboration, or whether the statement that Holmes has been identified as a drug dealer even relates to the charged offenses. The testimony that "numerous" unidentified "people," in unknown contexts, had, at some unknown point in time, identified Holmes as a drug dealer is so attenuated from the charged crimes, and so lacking in any indicia of reliability that it cannot, alone, serve as the corroboration necessary to obviate the need for the cautionary instruction warning against convicting based on the uncorroborated testimony of

accomplices.  We, therefore, hold that the trial court erred in refusing to give the cautionary instruction.

## C.  Harmless Error Analysis

Having concluded that the trial court erred in refusing to caution the jury about convicting based on the uncorroborated testimony of accomplices, we now consider, as is required, whether that error was harmless.  *See* Code § 8.01-678; *Clay v. Commonwealth*, 262 Va. 253, 259 (2001); *Dandridge v. Commonwealth*, 72 Va. App. 669, 685 (2021).  "Non-constitutional error is harmless if other evidence of guilt is so 'overwhelming' and the error so insignificant by comparison that we can conclude the error 'failed to have any "substantial influence" on the verdict.'"  *Dandridge*, 72 Va. App. at 685 (quoting *Lienau v. Commonwealth*, 69 Va. App. 254, 270 (2018)).  In a case such as this, where the trial court erred in refusing a cautionary instruction due to a lack of evidence corroborating accomplice testimony, there *cannot* be such overwhelming other evidence of guilt "that we can conclude the error failed to have any substantial influence on the verdict."  *Id.*  Denial of the cautionary instruction was not harmless error and remand for a new trial, thus, is appropriate. [4]

## III.  CONCLUSION

Viewed in the light most favorable to the Commonwealth, the record contained sufficient evidence to convict Holmes of two counts of racketeering.  Moreover, Jury Instructions I and Q

---

[4] Although in *Dillard* the Court noted that its "research ha[d] not disclosed a single instance where a conviction was reversed because of a failure to grant a cautionary instruction," that is no longer the case.  216 Va. at 822.  Shortly after *Dillard* was decided the Supreme Court reversed and remanded a case solely based on the trial court's error in refusing a cautionary instruction. *See Smith v. Commonwealth*, 218 Va. 455, 457 (1977) ("[T]he accomplice's testimony was not sufficiently corroborated, and it was error to refuse a cautionary instruction. Accordingly, the judgment of the trial court will be reversed, and the case will be remanded for a new trial."); *Ward v. Commonwealth*, 219 Va. 921, 926 (1979) ("For error in failing to grant the cautionary instruction, the judgment will be reversed and the case will be remanded for a new trial if the Commonwealth be so advised.").  The Supreme Court did not engage in harmless error analysis when reversing *Smith* and *Ward*.

were properly refused by the trial court as duplicative of other granted instructions. Nevertheless, the trial court erred in finding that the accomplice testimony of Hartless, Verdi, and Roger was sufficiently corroborated when it refused Jury Instruction T. Because this error was not harmless, we reverse and remand for a new trial.

*Affirmed in part, reversed in part, and remanded.*